[Civ. No. 26360. Fourth Dist., Div. One. Oct. 26, 1982.]

EUGENE M. HOOVER, Plaintiff and Respondent, v.
HARLEY A. HARTMAN, as Successor Trustee, etc.,
Defendant and Appellant.

1020

COUNSEL

Meserve, Mumper & Hughes, L. Allan Songstad, Jr., Andrew K. Ulich and Patricia A. Jones for Defendant and Appellant.

Kindel & Anderson and Angelo J. Palmieri for Plaintiff and Respondent.

OPINION

**WIENER, J.**—Harley A. Hartman (Harley) the trustee of the George L. Hartman Trust, appeals from the judgment entered on Eugene M. Hoover's (Eugene) petition for instructions (Prob. Code, § 11381, subd. (a)(4)) requiring the estate and inheritance taxes due upon the death of George L. Hartman (George) to be apportioned among the beneficiaries entitled to receive assets from George's taxable estate in accordance with Probate Code section 970.[1] Because we have concluded the trial court erred in refusing to consider extrinsic evidence in construing George's intent, from both his will and *inter vivos* trust on what he meant by the word "residue" in his will and whether he intended proceeds of the life insurance outside his gross taxable estate to be used as a source of payment of death taxes, we reverse the judgment.

*Factual and Procedural Background*

This controversy, which centers on the interpretation to be given to the several documents constituting George's estate plan, stems from facts which are generally undisputed. Although in the absence of evidence some of the following facts are undoubtedly more properly labeled presumptions, inferences or conclusions, we nonetheless state them factually, drawing upon Eugene's trial brief where necessary, for the overview of the setting in which George's estate plan was prepared.

John Hartman, the father of George and Harley, died in 1977. Later that year George and Harley became concerned with their respective estates. They each wanted to provide for the continuation of the family owned and operated business, Fullerton Mortgage and Escrow Company (Fullerton Mortgage), under control of the survivor of them. They contemplated, but rejected the idea of each leaving their stock directly to the survivor. Instead, they were advised to, and had prepared, virtually identical estate plans consisting of a will, an *inter vivos* trust and a buy-sell stock purchase

---

[1]All statutory references are to the Probate Code unless otherwise specified.

agreement. Each also purchased $675,000 of life insurance. They signed all the documents concurrently in September 1977.

George's *inter vivos* trust, which in pertinent part mirrored that of Harley's, provided that during his lifetime he was to be the trustee of his trust, retaining the right to revoke or modify it in whole or in part. Upon his death, the trust became irrevocable with Harley becoming the trustee. After George's death Harley was required to distribute the principal of the trust estate except for the shares of stock in Fullerton Mortgage to George's close friend, Eugene. The remaining principal of the trust was to be distributed equally to each of Harley's five children and Eugene upon the earlier occurrence of either Harley's death or the sale by the trust of all of the Fullerton Mortgage stock.

The trustee was given absolute discretion to pay either from the income or principal of the trust ". . . any inheritance, estate or death taxes that may be due by reason of the inclusion of any portion of the Trust Estate in the Trustor's taxable estate, unless the Trustee in its absolute discretion determines that other adequate provisions have been made for the payment of such expenses and taxes."

On the day George signed his trust he transferred to the trust all of his assets including his shares of Fullerton Mortgage stock.

George's will provided substantially the same as his trust. He gave all of the items of personal property to Eugene with the residue of his estate, excluding property over which he had the power of appointment, to his *inter vivos* trust. He nominated Harley as executor and directed ". . . that all estate and inheritance taxes payable as the result of my death, not limited to taxes assessed on property passing under this will, shall be paid out of the residue of my estate, and shall not be deducted or collected from any legatee, devisee, or beneficiary hereunder."

As an integral part of this estate plan, $675,000 of life insurance was purchased on their respective lives in order to provide the necessary liquidity in their estates. A $500,000 policy was paid for by Fullerton Mortgage in a split dollar arrangement whereby the company would become the beneficiary of $166,000 upon George's death with the balance to go into the *inter vivos* trust for distribution in accordance with the terms of that trust.

The stock purchase agreement with the company provided that upon the death of a shareholder, the corporation had the right to buy the deceased shareholder's stock. The life insurance proceeds received by the cor-

poration would be available for the down payment with the balance of the purchase price bearing interest at 7 percent per annum payable in installments over 10 years.

George died on June 4, 1978.[2] In February 1981, Eugene petitioned the court for instructions to Harley as successor trustee of George's trust. Eugene complained Harley was disregarding the terms of the trust by transferring the entire death tax burden to him by insulating the Fullerton Mortgage stock from imposition of any death taxes. Eugene asserted Harley's self-interest motivated him to inflate the value of the Fullerton Mortgage stock in order to increase the basis of that stock for later capital gains treatment while imposing an unfair burden on Eugene who was to pay all of the estate inheritance taxes. The stock represented about 60 percent of a gross taxable estate in excess of $1 million. In effect, Eugene contended Harley, as trustee, was legally obligated to comply with the mandate of section 970. Harley responded by referring to the provisions of the will which specifically directed that all estate and inheritance taxes be paid from the residue of the estate which, construed with the discretion given him as trustee and the purpose of the estate plan to preserve the stock of Fullerton Mortgage, authorized his using the life insurance proceeds payable to the trust, $367,000 of the $500,000 policy[3] as a source of payment of a portion of the taxes with any balance to be paid from assets other than the common stock.

At the hearing on Eugene's petition, except for taking judicial notice of the records of case No. A-108564, Estate of George L. Hartman, the trial court rejected extrinsic evidence. The court concluded George's trust and will "were not ambiguous in their meaning" and "[e]xtrinsic evidence [was] not required to . . . interpret the meaning of either the Trust or the Will." The court ruled the intent of the trustor when he signed the trust and the meaning of that document was to be determined solely from that document. Because the trust did not contain a clear and unambiguous direction against the proration of death taxes section 970 applied.

In interpreting the will, the court concluded that although there the decedent gave a clear and unambiguous direction against proration, the phrase "residue of my estate," construed and interpreted in the usual sense, meant residue of George's *probate* estate. Because there were no assets in the probate estate, the order requiring the probate residue to pay

[2] On May 20, 1981, George's will was admitted to probate and letters testamentary were issued to Harley.

[3] The parties agree the $500,000 proceeds of life insurance are not includable in George's estate for federal estate tax purposes.

death taxes did not, as a practical matter, qualify the court's direction to apportion taxes under section 970.

*The Court Erred in Rejecting Extrinsic Evidence on What the Testator Meant by the Word "Residue" in His Will*

Section 970 provides: "Whenever it appears upon any accounting, or in any appropriate action or proceeding, that an executor, administrator, trustee or other fiduciary has paid an estate tax to the Federal Government under the provisions of any Federal estate law, now existing or hereafter enacted, upon or with respect to any property required to be included in the gross estate of a decedent under the provisions of any such law, the amount of the tax so paid, *except in a case where a testator otherwise directs in his will, and except in a case where by written instrument executed inter vivos direction is given for apportionment within the fund of taxes assessed upon the specific fund dealt with in such inter vivos instrument,* shall be equitably prorated among the persons interested in the estate to whom such property is or may be transferred or to whom any benefit accrues." (Italics supplied.)

■ The purpose of the statute ". . . is to allocate equitably the burden of the tax among those who receive interests which are taxable, and only property which has contributed to the tax bears its impact." (7 Witkin, Summary of Cal. Law (8th Ed. 1974) Wills and Probate, § 458, p. 5897; see *Estate of Armstrong* (1961) 56 Cal.2d 796, 800 [17 Cal.Rptr. 138, 366 P.2d 490].) Section 970 is not a taxing statute. It assumes the tax has been paid or will be paid in the manner prescribed by the tax law and then provides how the burden of the payment shall be borne. (Annot., Construction and Application of Statutes Apportioning or Prorating Estate Taxes (1976) 71 A.L.R.3d 247, 267.) " 'The task of proration begins at the point where the taxing authorities end their duty of fixing the estate tax; it takes the accomplished fact of taxation and then prorates the burden on the actuality of the tax.' " (*Estate of Cummings* (1965) 236 Cal.App.2d 659, 661-662 [46 Cal.Rptr. 491] quoting *Estate of Buckhantz* (1953) 120 Cal.App.2d 92, 99 [260 P.2d 794].) In the absence of direction in the will to the contrary, ". . . the proration statute . . . expresses a general estate policy directing the executor to pay the federal estate tax and to fix the impact of the tax upon each beneficiary's share of the property that has contributed to the tax." (*Estate of Cushing* (1952) 113 Cal.App.2d 319, 333 [248 P.2d 482].) ■ " '[A]pportionment of the taxes is the general rule to which exception is to be made only where there is a clear and unambiguous direction to the contrary. Ambiguities are to be resolved in favor of apportionment.' " (*Estate of Hendricks* (1970) 11 Cal.App.3d 204, 206 [89 Cal.Rptr. 748] quoting from *Estate of Armstrong, supra,* 56

Cal.2d at p. 802.) Underlying the foregoing is the rationale that in the absence of apportionment one beneficiary is unjustly enriched at the expense of the other.

 Because of the strong policy in favor of statutory apportionment, those contending against it must bear the burden of proof. (*Estate of Cummings, supra,* 263 Cal.App.2d at pp. 667-668.) The mere intent to render the statute inapplicable will not be inferred from vague and uncertain language. (*Estate of Armstrong, supra,* 56 Cal.2d at p. 803.) "Extrinsic evidence of intent cannot be utilized to construe an ambiguous direction on this subject, because the very existence of the ambiguity demands proration. If the will is not ambiguous, evidence of intent *dehors* the will is inadmissible; if it is ambiguous, the evidence is unavailing." (*Estate of Hendricks, supra,* 11 Cal.App.3d at p. 208, italics in original.)

 It is this last quotation from *Hendricks* which seems to have contributed to the conundrum in the present appeal. Superficially, the statements run counter to the general rule which requires that "[a] will must be construed according to the testator's intention and his intention must be given effect to the extent possible." (*Estate of Stokley* (1980) 108 Cal. App.3d 461, 467 [166 Cal.Rptr. 587].) And ". . . where the language of a will . . . appears to be ambiguous or uncertain, extrinsic evidence may be considered to ascertain the maker's intention. (*Estate of Dodge, supra,* 6 Cal.3d 311, 318-319 [98 Cal.Rptr. 801, 491 P.2d 385]; *Estate of Russell* (1968) 69 Cal.2d 200, 206 [70 Cal.Rptr. 561, 444 P.2d 353]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]; *Estate of Taff* (1976) 63 Cal.App.3d 319, 324-325 [133 Cal.Rptr. 737]; see generally Annot. 70 A.L.R.3d 630, 639-645.)" (*Estate of Steele* (1980) 113 Cal.App.3d 106, 119 [169 Cal.Rptr. 635].) Moreover, the court must accept extrinsic and parol evidence of the circumstances surrounding the execution of the instrument to determine whether a seemingly clear instrument or term is actually ambiguous. (*Estate of Russell* (1969) 69 Cal.2d 200, 207-212 [70 Cal.Rptr. 561, 444 P.2d 353]; *Estate of Casey* (1982) 128 Cal.App.3d 867, 872 [180 Cal.Rptr. 582].)

Here, in accepting *Hendricks* literally, the court rejected extrinsic evidence including the proffered declaration of the draftsman of the will and declaration of trust. But *Hendricks* cannot be read as supplanting the general rule on interpretation of wills.[4] *Hendricks* only explains that where

---

[4] " 'The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.' " (*Estate of Dodge, supra,* 6 Cal.3d 311, 324 [98 Cal.Rptr. 801, 491 P.2d 385], quoting *Estate of Wilson* (1920) 184 Cal. 63, 66-67 [193 P.581], fn. omitted.)

there is no reference to proration of taxes in the will extrinsic evidence is inadmissible. In emphatic terms the court there stated: "[O]ne scans the will and codicil in vain for any reference to taxes. The reference simply does not exist." (*Id.*, 11 Cal.App.3d at p. 207.)

■ In the case before us, the will clearly and categorically provides estate taxes shall be paid from the residue of the estate. If judicial scrutiny is limited to the four corners of the document no ambiguity exists with reference to George's intent on apportionment. The ambiguity that arises is caused by the absence of probate assets with resultant uncertainty as to what George meant by the word "residue." Although admittedly there will be a relationship between the ultimate definition of residue and how the estate tax burden will be borne, that relationship does not preclude admission of extrinsic evidence on what the testator meant by the phrase "residue of my estate." Our reasoning and conclusion is supported by *Estate of Steele* where the court in a closer question held, "While section 970 provides that proration shall apply unless [the] 'testator otherwise directs in his will,' we do not interpret this to mean that if the words used by the testator appear to be unclear or ambiguous *on apportionment of taxes,* extrinsic evidence is inadmissible to show that the language used was intended as direction against proration." (*Id.*, 113 Cal.App.3d at pp. 119-120, italics supplied.)

*The Testator's Direction in His Will on Apportionment of Taxes May Control Assets Contained in the Testator's Inter Vivos Trust*

■ Eugene contends that even if the meaning of ambiguous words in a will may be explained through extrinsic evidence, the will here does not control. He asserts because all of George's assets were in the trust we must look to the trust instrument for guidance and since there is no clear direction in that document against apportionment, section 970 applies.

The statute does not require that the direction against apportionment must be contained in both the will and the trust. The statute refers only to "any property required to be included in the *gross estate* of a decedent" with the tax burden ". . . equitably prorated among the persons interested in *the estate* to whom such property is or may be transferred or to whom any benefit accrues." (Italics supplied.) There is no reference in the statute to "probate estate" or "trust estate." It would have been easy enough for the Legislature to have provided that any direction as to nonapportionment in a will or in a trust would be limited in its operation to the property passing under the will or trust. (See 71 A.L.R.3d, *supra,* at p. 315.) The apparent concern of the Legislature was that the direction against nonapportionment be contained in only one of two documents, a will or

declaration of trust, both of which are generally associated with thoughtful and deliberative action. Because of the significance of directing against apportionment of taxes it is understandable why the Legislature was cautious in approving the type of documents which could be used for this purpose. Once having limited the form of the documents, the Legislature's unwillingness to further restrict the scope of the direction is understandable.

Eugene places great reliance on *Security First Nat. Bank* v. *Wellslager* (1948) 88 Cal.App.2d 210 [198 P.2d 700] for the proposition that George's intent on proration of taxes relating to property passing under his trust must be ascertained from the trust instrument alone. (*Id.,* at p. 218.) There, however, the court was solely concerned with a trust and various provisions of the trust instrument. Here, we are confronted with an integrated estate plan, including both a will and *inter vivos* trust executed together to accomplish the same purpose. *Security,* on different facts with a different issue, is not controlling.

Both parties concede a testator controls his probate assets and may direct those assets are to be used for the payment of taxes due on trust assets. Thus, a testator may shift the burden from trust assets to probate assets. (See *Estate of Parker* (1950) 98 Cal.App.2d 393 [220 P.2d 580]; *Estate of Stokley, supra,* 108 Cal.App.3d 461.) We see no reason, in light of our interpretation of the statute and the absence of precedent on this issue, why the reverse should also not be allowed.[5]

We recognize, as a matter of policy, allowing extrinsic evidence here may contribute to a permissiveness in estate planning where the standard should be thoughtful precision, clarity and meticulous selection of words and phrases. Obviously, a cautious draftsperson could have avoided the problem here by coordinating the terms of the will and trust. (See Cohan, Drafting California Revocable Inter Vivos Trusts (Cont.Ed.Bar 1972) § 4.51, pp. 128-129; § 6.23, pp. 196-197.) Nonetheless, in our view a trade off of tolerating imprecision is preferable to theoretical judicial percipience where a court attempts to substitute its judgment for that of the testator on the key issue of intent. Here for example the court's conclusion was tied to its reasoning that because the will refers to "the estate" or "my estate" and

---

[5]Eugene cites *Estate of Anthony* (1964) 230 Cal.App.2d 766 [41 Cal.Rptr. 317] and *Estate of Sharp* (1971) 18 Cal.App.3d 565 [95 Cal.Rptr. 816] as authority that only where a will exercises a power to appoint may it direct the payment of death taxes by the trust. Neither case, however, involved a section 970 issue. Moreover, in *Anthony,* because of the testator's intent, "my estate" included both his probate and trust estate. In *Sharp,* again because of the testator's intent, a different result was reached. Although inapposite to the question presented in this appeal, the holdings both stress the importance of ascertaining the testator's intent.

the trust refers to the trust assets as the "trust estate," the phrase "residue of my estate" meant *probate* estate. Whether this conclusion is ultimately determined to be correct is irrelevant. Our concern has been with the process through which this conclusion was reached. Because we believe that a process which includes the admission of relevant extrinsic evidence will invariably result in a more accurate finding on controverted issues, we hold the court's rejection of extrinsic evidence was prejudicial error.

*The Court Prejudicially Erred in Rejecting Extrinsic Evidence on the Testator's Intent on the Source of Payment of Death Taxes*

█ As a separate argument Harley contends there is another reason why section 970 does not apply. Although the statute ordinarily requires federal estate taxes to be prorated only among the beneficiaries whose gifts or legacies created the tax (see *Estate of Lock* (1981) 122 Cal.App.3d 892, 901-902 [176 Cal.Rptr. 358]; *Estate of Pearson* (1949) 90 Cal.App.2d 436, 439 [203 P.2d 52]), Harley explains the trust provisions here authorize an exception to that general rule permitting him to use the $367,000 of life insurance proceeds as a source to pay part of those taxes. Specifically, he directs us to the provision in the trust where the trustee is required to pay expenses and taxes from either income or principal *unless in his absolute discretion he determines that other adequate provisions have been made for the payment of those taxes.* (See *ante,* p. 1023.) Harley argues ". . . that other adequate provisions [were] made for the payment of such . . . taxes" through the purchase of the $500,000 insurance policy which resulted in the trustee receiving $367,000 outside the gross taxable estate upon George's death. Under their estate plans, the survivor as trustee was to use those proceeds for the payment of death taxes in order to preserve the stock in Fullerton Mortgage. Harley says the clear purpose and design of the estate plan is corroborated by the declarations of three witnesses which the court refused to receive.

Eugene counters by furnishing another explanation of the estate plan which he claims is equally apparent. Obviously, the insurance proceeds were to supply liquidity to the estate, but not for the payment of taxes. Under applicable provisions of the Internal Revenue Code (see Int.Rev. Code, §§ 6166, 6621 (b)) where a closely held business comprises 35 percent or more of an estate, the federal estate taxes attributable to the business may be paid over 10 years in equal installments at the prevailing rate of interest charged by the Internal Revenue Service. Here, allegedly the combined effect of the 10 year buy-out of the Fullerton Mortgage stock at a 7 percent interest rate places the bulk, if not the entire burden of estate taxes, on the corporation. Thus, George's intent is clear. Upon his death the corporation has liquidity, $166,000 of life insurance proceeds, to make the down

payment for the stock, the interest on the purchase price effectively offsets the interest charged by the Internal Revenue Service and at the end of the 10 years the balance of the purchase price of the stock will be used to pay the balance of death taxes.

As logical and cogent as each argument may be, we are inclined to accept Eugene's trial counsel's observation when he exclaimed at the hearing that the arguments of counsel were "like two trains passing in the night."

In our view there is no need for a trial court to gamble on the destination of one passing train over another when relevant evidence will aid in selecting the proper destination. Our earlier discussion applies with equal force on the disputed issue of George's "clear" intent on the authority given to the trustee on disposition of insurance proceeds. We hold the court prejudicially erred in rejecting evidence on this issue also.

*Disposition*

Judgment reversed.

Staniforth, Acting P. J., and Borunda, J.,* concurred.

A petition for a rehearing was denied November 10, 1982, and respondent's petition for a hearing by the Supreme Court was denied December 22, 1982.

---

*Assigned by the Chairperson of the Judicial Council.