[No. C035887. Third Dist. Oct. 9, 2001.]

Estate of HASKELL J. DYE, Deceased.
SCOTT T. DYE, Petitioner and Appellant, v.
PHILLIP JOE BATTLES et al., Objectors and Respondents.

**COUNSEL**

Baker, Manock & Jensen, Kathleen A. Meehan and Pa Lai V. Lee For Petitioner and Appellant.

Scott, Nichols & Matteucci and Michael J. Matteucci for Objectors and Respondents.

## OPINION

**MORRISON, J.**—This case illustrates the danger of using preprinted wills. Decedent Haskell J. Dye had two natural sons who were adopted away (with his consent) by his first wife's new husband (Arthur Battles) in 1959. Under the law at that time, this cut off their right to inherit from him. The law was changed, effective 1985, to permit some adopted-out children to inherit from their natural parents. In 1989 decedent and his second wife Eleanor signed reciprocal form wills, leaving their property to each other. Eleanor died in January, 1999. Decedent died on June 17, 1999.

Scott T. Dye, Eleanor's son who had been adopted by decedent, petitioned to probate decedent's estate. Phillip Joe Battles, one of decedent's adopted-away natural sons, and some of the issue of the deceased adopted-away son (Jimmie Dean Battles) filed an objection, seeking to share in decedent's estate. The trial court granted their heirship petition and Scott filed a notice of appeal. The appeal lies. (Prob. Code, § 1303, subd. (g); further unspecified references are to this code.) We first conclude the new law enables the objectors to take a share of the decedent's estate. We also conclude an antilapse statute does not apply because a person's spouse is not his or her "kindred," as defined. We shall affirm.

### DISCUSSION

### I.

Adoption began with Roman law, and exists by statutes in derogation of common law. (*Estate of Renton* (1892) 3 Coffey's Prob. Dec. 519, 524-526.) Thus, at first, courts were hostile to adoption. (See *Ex Parte Clark* (1891) 87 Cal. 638, 641 [25 P. 967] ["We have held that our law of adoption is not unconstitutional [citation], but to acquire any right under it its provisions must be strictly followed, and all doubts in controversies between the natural and the adopting parents should be resolved in favor of the former."]; *In re Newman* (1927) 88 Cal.App. 186, 189 [262 P. 1112], disapproved by *Adoption of Barnett* (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18].) This is no longer true. (*San Diego County Dept. of Pub. Welfare v. Superior Court* (1972) 7 Cal.3d 1, 16 [101 Cal.Rptr. 541, 496 P.2d 453]; *Tyler v. Children's Home Society* (1994) 29 Cal.App.4th 511, 529 [35 Cal.Rptr.2d 291] [adoption requirements " 'are to be liberally construed in order to effect the object of the adoption statutes in promoting the welfare of children' "].) But because it is based on statutes displacing the common law, adoption "does not deprive [an adoptee] of his right to inherit from his relatives by blood, unless the statute provides otherwise." (Note foll. *Estate of Renton,*

*supra,* 3 Coffey's Prob. Dec. at p. 536, citing *Humphries v. Davis* (1885) 100 Ind. 247 [50 Am. Rep. 788] [tracing rule to Justinian] and *Clarkson v. Hatton* (1898) 143 Mo. 47 [44 S.W. 761].)

Adoption creates a legal relationship of parent and child, which "implies that the natural relationship between the child and its parents by blood is superseded. The duties of a child cannot be owed to two fathers at the same time." (*Estate of Jobson* (1912) 164 Cal. 312, 316-317 [128 P. 938].) The California Supreme Court reasoned, "From the time of the adoption, the adopting parent is, so far as concerns all legal rights and duties flowing from the relation of parent and child, the parent of the adopted child. From the same moment, the parent by blood ceases to be, in a legal sense, the parent. His place has been taken by the adopting parent." (*Id.* at p. 317.)

But this is not the only plausible view. A dissenting opinion by two justices in the case just quoted (consistent with Judge Coffey's views) would have held the natural parent remains as a default, in the event the adoption fails, as by death of the adopting parent: "In my opinion the true principles governing the construction and application of statutes providing for the adoption of children is that the natural relation and the laws governing it, are thereby altered and affected only so far as the statute of adoption by its terms declares or provides, either expressly or by necessary implication, and no farther. Like an invading force upon a hostile domain, it prevails and controls only so far as its lines extend. . . . [¶] . . . [¶] . . . There is not in the adoption statute a word to the effect that, where the adoption has served its purpose by prevailing over the natural relation during the joint lives of the two parties . . . it shall thereafter continue for any purpose, or that there is to be thereafter any legal ·or constructive kinship, or mutual rights of inheritance, between the adopted child and the natural kin of the deceased foster parent, or between the foster parent and the natural kin of the deceased child. . . . The result should be and would be that, after this termination of the mutual relation, the inheritance from the survivor, upon his subsequent death, will be controlled by the general law of descent and the natural relationship will prevail. There will be then no artificial relation existing to cause a different course of descent from that to the natural kin." (*Estate of Jobson, supra,* 164 Cal. at pp. 318-320 (dis. opn. of Shaw and Lorigan, JJ.); see *Estate of Zook* (1965) 62 Cal.2d 492 [42 Cal.Rptr. 597, 399 P.2d 53] [gift to adopted-out grandchildren not covered by higher taxing scheme applicable to gifts to strangers, because devisees were "lineal issue" *for tax purposes*].)

Echoing this disagreement, the Legislature has changed its view on the effect of an adoption on the blood relationship.

For our purposes, it suffices to begin with former section 257 as it read in 1959, after a 1955 amendment: "An adopted child shall be deemed a descendant of one who has adopted him, the same as a natural child, for all purposes of succession by, from or through the adopting parent the same as a natural parent. An adopted child does not succeed to the estate of a natural parent when the relationship between them has been severed by adoption, nor does such natural parent succeed to the estate of such adopted child." (Stats. 1955, ch. 1478, § 1, p. 2690.) This legislation provided that the adopted child had rights of inheritance in and only in the estate of the adoptive parents. (*Estate of Dillehunt* (1959) 175 Cal.App.2d 464, 467 [346 P.2d 245]; *Estate of Dolan* (1959) 169 Cal.App.2d 628, 629 [337 P.2d 498]; see *Estate of Goulart* (1963) 222 Cal.App.2d 808, 820 [35 Cal.Rptr. 465] [purpose of 1955 amendment was to abrogate the holding in *Estate of Calhoun* (1955) 44 Cal.2d 378 [282 P.2d 880], and adopt Justice Traynor's dissent].)

The parties agree that when decedent's sons were adopted by their mother's new husband, this statute cut off their rights to inherit under the intestacy laws at that time. (See *Estate of Hart* (1984) 165 Cal.App.3d 392, 394, fn. 1 [209 Cal.Rptr. 272].)

 This rule was changed by a new statute, effective January 1, 1985, which has gone through various amendments. (Former § 6408 added by Stats. 1983, ch. 842, §§ 19, 55, pp. 3024, 3083.) In 1993 the language of the present section 6451 was adopted. (Stats. 1993, ch. 529, § 5, p. 2715.) Now an adoption severs the blood relationship "unless both of the following requirements are satisfied: [¶] (1) The natural parent and the adopted person lived together at any time as parent and child[.] [¶] (2) The adoption was by the spouse of either of the natural parents[.]" (§ 6451, subd. (a).) California is not alone in providing by statute for adopted-out children to inherit from their natural parents when the adoption was by a stepparent. (See, e.g., *Raley v. Spikes* (Ala. 1993) 614 So.2d 1017; *Estate of Carlson* (Minn.Ct.App. 1990) 457 N.W.2d 789.)

Before Jimmie Dean and Phillip Joe were adopted out, decedent lived with them, and their adoption was by the new husband of their mother, decedent's former wife. They satisfy the new exception to the statute. (Cf. *Estate of Carlson, supra*, 457 N.W.2d 789 [not a stepparent adoption, no right to inherit].)

In 1989, after the change in the law, decedent and Eleanor wrote their wills. Eleanor died in 1999, leaving her property to decedent. He died later in 1999, leaving everything to Eleanor. Therefore—apart from an antilapse claim discussed below—when he died, his estate lapsed.

Where, as here, the decedent has no surviving spouse, the estate passes "To the issue of the decedent, the issue taking equally if they are all of the same degree of kinship to the decedent, but if of unequal degree those of more remote degree take in the manner provided in Section 240." (§ 6402, subd. (a).) Section 240 provides for distribution per stirpes. (See *Estate of Careaga* (1964) 61 Cal.2d 471, 476 [39 Cal.Rptr. 215, 393 P.2d 415].)

Application of these statutes allows the objectors to inherit part of the estate, which, based on the evidence would be divided into thirds: one-third to Scott (an adopted-in son of the decedent); one-third to Phillip Joe (an adopted-out son who satisfies the new statute) and one-third to the heirs of Jimmie Dean (also an adopted-out son who satisfies the new statute). (See § 6402.) The trial court so held.

## II.

Scott asserts in his brief that decedent and Eleanor did not consult a lawyer and thought he was their only lawful heir, and that decedent never intended to benefit objectors, "some of whom he never even met." Scott urges the case should be remanded so he can introduce evidence to establish decedent's intention regarding the adopted-out children.

### A.

Assuming Scott accurately sets forth decedent's wishes, decedent could have expressed such intention by inserting into the will "I disinherit Phillip Joe and Jimmie Dean," or he could have given them each "one dollar." On Eleanor's death he could have written a new will or a codicil naming Scott as sole beneficiary. Decedent did none of these things.

Accordingly, like any other case of intestacy, the courts must apply the default provisions of the intestacy rules set forth by the Legislature. It is presumed citizens know the law, including the intestacy laws, and it is up to any person who does not want those laws applied to his or her estate to opt out by preparing a will setting forth other dispositions. Decedent did not so provide and therefore is presumed to endorse application of the default intestacy laws. This accords with the general rule that the law governing a will is measured as of the date of death, under the fiction that until then, the decedent is presumed to know the law and has the power to change his will.

In a converse fact pattern, where a will and death preceded the 1985 change in the inheritance rights of adoptees, the California Supreme Court refused to apply the new law: "It is more reasonable to assume that a testator

who intends a different disposition will make express provision governing the status of adopted children than to assume that the testator intends that their status not be established until some future time and be contingent upon legislative fiat." (*Newman v. Wells Fargo Bank* (1996) 14 Cal.4th 126, 140 [59 Cal.Rptr.2d 2, 926 P.2d 969] (*Newman*).) There is some discussion in the cases about whether the law in effect at the time of making a will should control, where the law changes after the making of the will but before death or incapacity (see, e.g., *id.* at pp. 138-139 & fn. 10), although it would seem the law in effect at the time of death controls in such cases, because the testator presumably can change the will in light of new legislation. (See *Estate of Dillehunt, supra,* 175 Cal.App.2d at p. 468; *In re Tilliski's Estate* (1944) 323 Ill.App. 490, 492 [56 N.E.2d 481, 482] [intestacy case: "descent statutes may be changed by the Legislature at any time before the right of inheritance has become fixed [by death of testator]"], affd. (1945) 390 Ill. 273 [61 N.E.2d 24].) This differs from the rule about using law as an extrinsic aid to ascertain the decedent's intention; in such cases, one looks to the law in effect at the time of drafting. (*Estate of Heard* (1951) 107 Cal.App.2d 225, 232 [236 P.2d 810, 27 A.L.R.2d 1313] ["[I]t must be presumed that the person who drafted the intricate will, as well as the testator, must have had the law in mind as it prevailed at that time. The will should be interpreted accordingly."].)

Here, both the drafting of the will and death occurred after the critical revision to the probate laws.

Where Scott goes astray is in characterizing the effect of the new adoption statute as one which "legally restores parent-child relationships which were legally severed." The statute does not retroactively undo adoptions, it prospectively defines circumstances under which an adopted-out child can invoke intestacy laws and inherit from a natural parent.

Generally, "in the absence of any contrary provision or indication, the law in force at the death of the decedent is applicable in all cases, regardless of the time of adoption . . . . [T]he right to property by inheritance does not become vested until the death of the owner, and . . . the legislature, therefore, may lawfully regulate the course of the descent and distribution of the property or persons thereafter dying intestate. The argument in opposition, that to apply the statute in the case of prior adoptions would give it retroactive operation has not been successful." (Annot., What Law, in Point of Time, Governs Inheritance from or Through Adopted Person (1957) 52 A.L.R.2d 1228, § 2, fn. omitted.)

In *Morgan v. Mayes* (1982) 170 W.Va. 687 [296 S.E.2d 34], the precise issue was whether the adopted-in son of decedent's son had standing to

challenge her will on the ground of undue influence, and this question required a determination whether he had any rights to inherit. At the time the adoption occurred, West Virginia law precluded an adopted child from inheriting by right of representation, but by the time the will (with the lapsed gift) was written, the law had been changed. The court observed: "The majority rule is that statutes enlarging the inheritance rights of adopted children, in effect at the death of the person from whom the inheritance is claimed, control the adopted child's rights[.]" (170 W.Va. at pp. 688-689 & fn. 3 [296 S.E.2d at pp. 35-36], citing, inter alia, *In re Gray's Estate* (D.D.C. 1958) 168 F.Supp. 124, 126 ["the weight of authority supports the view that the right of an adopted child to inherit is to be determined by the law in force at the death of the person from whom the inheritance is claimed"]; *In re Miner Estate* (1960) 359 Mich. 579, 583 [103 N.W.2d 498, 500] [two weeks before decedent's death, statute took effect that allowed adopted children to inherit from their natural parents; held: statute controls]; *Black v. Washam* (1967) 57 Tenn.App. 601, 603 [421 S.W.2d 647, 648] ["those statutes in force at the time of death of intestate and not those in force at the time of adoption govern and control"]; *Hamilton v. Butler* (Tex.Civ.App. 1965) 397 S.W.2d 932, 933 [rule "established"].)

In *Wheeler v. Myers* (1997) 330 Ark. 728 [956 S.W.2d 863], adopted-out children of the decedent's child sought their intestate share of the estate. They had been adopted in 1961, when Arkansas law did not cut off their rights, but the law was changed in 1977 and the decedent died thereafter. The court rejected the claim that the law at the time of adoption controlled and concluded that because a living person has no heirs, one's heirs are not known until one's death, at which time the then applicable inheritance laws must be consulted. (*Id.*, 330 Ark. at pp. 730-732 [956 S.W.2d at pp. 864-865]; see also *Huskea's Estate v. Doody* (Fla.Dist.Ct.App. 1980) 391 So.2d 779, 780 ["Until the natural father died, the natural [but adopted-out] son had had only an expectancy or prospect of inheritance; he was an heir apparent." (fn. omitted); the local law allowed the inheritance at the time of the stepparent adoption, but had cut off such rights by the time of decedent's death]; *In re Williams* (1958) 154 Me. 88, 91-94 [144 A.2d 116, 117-119] ["the right to inherit property from or by an adopted person is determined by the law of descent in effect at the time of the death of the intestate"].)

Accordingly, we presume decedent was aware of the state of the law in 1989 and understood the possibility all of his natural children would share in his estate. If he wanted to change this result, he could easily have inserted a provision in his will to disinherit any or all of his natural children. He did not.

## B.

Seizing on language in *Newman, supra,* 14 Cal.4th 126 to the effect that a court must presume provisions in a will reflect an understanding of existing law, Scott asserts he should have the right to *rebut* the presumption and show what his father really wanted. This misapprehends the usage of "presume" in this context. More properly stated, Scott wants the trial court to consider extrinsic evidence about his father's intentions, claiming an ambiguity exists in the will, or he wants to have this court rewrite the will, to "reform" it.

### 1.

An ambiguity arises when language may be applied in more than one way. To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which is meant. Every substantial claim of ambiguity must tender a candidate reading of the language which is of aid to the claimant. One must ask what meanings are proffered and examine their plausibility in light of the language. A party attacking a meaning succeeds only if the attacker can propose an alternative, plausible, candidate of meaning. (See, e.g., *City of Sacramento v. Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 793-795 [27 Cal.Rptr.2d 545] [discussing claim of statutory ambiguity].)

In some cases, portions of a will can be deemed ambiguous, permitting resort to extrinsic evidence of a testator's knowledge and purpose. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98 Cal.Rptr. 801, 491 P.2d 385] ["we may utilize extrinsic evidence to aid in construing the will if we find that the will is 'ambiguous' or, more precisely, that in the light of both the language of the will and the circumstances under which it was made, the will is reasonably susceptible of more than one interpretation"]; see § 6111.5 ["Extrinsic evidence is admissible . . . to determine the meaning of a will or a portion of a will if the meaning is unclear."].) But we conclude no semantic ambiguity exists in this case. What Scott wants to do is develop background facts to try to show what his father most likely wanted to do in these circumstances. Courts discern testamentary intent by applying a will's terms and the applicable law (see § 21102 ["The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made"]), not by discerning the *unexpressed* wishes of decedents.

In the trial court Scott made an offer of proof which fails to raise any semantic ambiguity in the will. His declaration states the facts therein are based on his "personal knowledge except those matters which I have indicated I believe to be true," but the most significant facts are statements of his

belief, including: (1) that his parents did not consult a lawyer; (2) that his father believed his relationship with his adopted-away children had been severed; and (3) that his father had no knowledge of the applicable California law. Other portions of Scott's offer of proof are as follows: (1) *Scott* believed his father's relationship with the adopted-away children had been severed "Based upon more than forty years of family history;" (2) his father always indicated he, Scott, would inherit his estate, and had been planning to arrange for assets to go to Scott outside of probate prior to his death; and (3) "There is a least one, and perhaps more, third party witness(es) who has knowledge of my father's intent . . . and I believe that an expert can easily establish how unlikely it was that my father would have known about the 1985 change in the law."

These tendered facts do not create any ambiguity in the will because they fail to raise a semantically plausible alternative candidate of meaning. If true, they show his father should have consulted a lawyer, because to effectuate his beliefs he needed to have a valid will disinheriting his adopted-out children. By this offer of proof Scott is not even trying to establish an ambiguity about the terms of the will, he is trying to establish his father's probable intention *in the event the disposition in the will failed.* He wants to impeach the general rule that people know the law, to have the default lapse (and antilapse) rules rendered inapplicable. He wants to have a trial on intent to take the place of a lawful will disinheriting the other children. We know of no authority allowing such a trial. (See 12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, § 324, p. 359, summarizing *Estate of Casey* (1982) 128 Cal.App.3d 867, 873 [180 Cal.Rptr. 582] ["Extrinsic evidence could not be offered to show that the testator would have made a different provision if he had anticipated that the named devisee . . . would predecease him"].)

At another point in his brief, Scott points out that when *he* was adopted by decedent in 1960, a recital in the adoption order states decedent had "no children, the issue of any marriage with any other person." This assertion is of no moment. Either the recital was wrong, or it reflected that, under the law in 1960, decedent did not consider the adopted-out children to be pertinent to this recital. Neither possibility changes the fact that when he wrote his will, those children could inherit from him, unless he disinherited them, and neither raises any semantic ambiguity in the will.

We return to Scott's complaint that the trial court should not have applied a "conclusive presumption" to the will. ▮▮▮ When courts speak of using extrinsic evidence to rebut a presumption, this means evidence that a decedent's *expression in a will* actually has a different meaning than first appears,

or a "latent" ambiguity. The *Dodge* case is a good example. Lawyers use "personalty" or "personal property" in contrast to "realty" and "real property." However, some people use "personal property" to mean tangible personal effects, such as clothing, jewelry and so forth. Thus, when a will gives the "personal property" to somebody, somebody else could come in with evidence outside the corners of the will to show what the decedent thought the word meant, e.g., a lawyer testifying he told the decedent before the will was signed what it meant. (*Estate of Dodge, supra,* 6 Cal.3d at pp. 318-319.) In *Estate of Russell* (1968) 69 Cal.2d 200, 206-213 [70 Cal.Rptr. 561, 444 P.2d 353] (*Russell*), the California Supreme Court made clear that extrinsic evidence could be used not only to resolve a patent ambiguity, but also *to identify a latent ambiguity.*

But an ambiguity, whether patent or latent, must reside *in* the will. "[T]he court must attempt to ascertain the intent of the testator by examining the will as a whole and the circumstances surrounding its execution." (*Newman, supra,* 14 Cal.4th at p. 134; see *Estate of Webb* (1977) 76 Cal.App.3d 169, 174-175 [142 Cal.Rptr. 642]; *Hoover v. Hartman* (1982) 136 Cal.App.3d 1019, 1025-1027 [186 Cal.Rptr. 669] [meaning of "residue" ambiguous under the circumstances].) A court cannot " 'invoke [extrinsic] evidence to write a new or different instrument.' " (*Russell, supra,* 69 Cal.2d at p. 209.)

 The *Newman* decision does not support Scott's claim that extrinsic evidence of the sort he tenders is admissible. That case involved a testamentary trust which benefited certain "issue" and the court concluded, in the absence of extrinsic evidence, that because the death occurred before the change in the adoption law, the testator did not intend an adopted-out line to qualify as "issue." (*Newman, supra,* 14 Cal.4th at pp. 140-141.) The court did not implicitly endorse use of extrinsic evidence to prove the intent of a testator except when such evidence elucidates a term of an instrument (there, "issue").

Scott's characterization of the problem as one of "latent ambiguity" does not help him. We agree a latent ambiguity may be created by consideration of extrinsic evidence. For example, where a will gave money to " 'my children,' " extrinsic evidence showed the decedent had six children by his second wife, but also two children by a prior wife, which two children had (like in this case) been adopted by decedent's former wife's new husband; this extrinsic evidence created a doubt about the scope of "children" in the will. In such cases, "Existing statutory and case law is one of the extrinsic aids which may be consulted in resolving a will ambiguity by construction. [Citations.] The reason for this is that the testator is presumed to know the law—both statutory and case law." (*Estate of McDonald* (1963)

20 Wis.2d 63, 65 [121 N.W.2d 245, 247-248, 96 A.L.R.2d 634].) ▪ But the extrinsic evidence here did not establish any latent ambiguity in the will.

▪ Scott contends the decedent's use of the following language is ambiguous: "I give . . . all of my estate . . . to my wife, Eleanor M. Dye, to be her sole and separate property." He states that the phrase "sole and separate property" is ambiguous. He asserts it means: "Haskell intended all of his estate to go only to his wife under any and all circumstances surrounding his death and the act of so disposing of his property manifests his intent that Eleanor's heir, Scott, would be entitled to the estate if Eleanor passed before Haskell." That is not a reasonable construction of the language, but an effort to insert new language and ideas into the will. "The instrument is silent upon the possibility of the wife predeceasing the testator. If he had contemplated a substitutional gift over he should have made such intention clearly appear." (*Estate of Sowash* (1923) 62 Cal.App. 512, 517 [217 P. 123]; *Estate of Carey, supra,* 128 Cal.App.3d at p. 873.) "Therefore, if having ascertained in the instant case that the provisions of the will are not reasonably susceptible of two or more meanings, we conclude that the only meaning to which the words expressed by testatrix are reasonably susceptible results in intestacy, we must give effect to her will accordingly." (*Russell, supra,* 69 Cal.2d at p. 213.) ▪ So it is here. That this causes a lapsed gift is no reason to rewrite the will. (*Id.* at pp. 215-216.)

### 2.

Scott ultimately makes explicit what is implicit in the above argument: He asks that this court "reform" the will to give effect to his father's wishes. The meager authority he cites does not support his request.

First, Scott relies on a Restatement proposal. (Rest.3d Property, Donative Transfers (Tent. Draft No. 1, Mar. 28, 1995) § 12.1; hereafter Tentative Draft section 12.1.) The text provides "As of the date of publication, this draft has not been considered by the members of The American Law Institute and does not represent the position of the Institute on any of the issues with which it deals." (*Id.,* Tent. Draft, § 12.1, title page.) Therefore, this proposal lacks any authoritative foundation.

Second, the Restatement proposal would not authorize wholesale rewriting of wills. It would allow reformation of an unambiguous donative document if clear and convincing evidence establishes the donor's true intention and "that a mistake of fact or law, whether in expression or inducement, affected specific terms of the document[.]" (Tent. Draft, § 12.1; see *id.,* com.

b, p. 114 ["evidence suggesting that the terms of the document vary from intention is inherently suspect but possibly correct. . . . [This proposal allows a court] to consider the evidence, but guard against . . . fraudulent or mistaken evidence by imposing an above-normal standard of proof"].) However, "Reformation is not available to correct a failure to prepare and execute a document [citation]. Nor is reformation available to modify a document in order to give effect to the donor's post-execution change of mind (Illustration 2) or to compensate for other changes in circumstances [citation]." (*Id.*, § 12.1, com. (h), p. 119.)

Illustration (2), cited in the above comment, is as follows: "G validly executed a will that devised his estate to his sister, A. After execution, G formed an intent to alter the disposition in favor of A's daughter, X, in the mistaken belief that he could substitute his new intent by communicating it to X orally. [¶] G's oral communication to X does not support a reformation remedy. Although a donative document exists that could be reformed by substituting 'X' for 'A,' the remedy does not lie because G's will was not the product of mistake. The will when executed stated G's intent accurately. G's mistake was his subsequent failure to execute a codicil or a new will to carry out his new intent." (Tent. Draft, § 12.1, illus. (2), p. 120.) That illustration fits this case: Decedent's will said exactly what he wanted to say: Had Eleanor survived, the will would have given her everything. Upon her death, his "mistake" if any "was his subsequent failure to execute a codicil or a new will to carry out his new intent," namely, to provide for Scott to the exclusion of the other children. The problem is (accepting Scott's evidence and suppositions as true) that the will left out instructions on what to do if Eleanor predeceased decedent, or failed to substitute Scott for Eleanor (as G failed to substitute X for A in the illustration just discussed). Decedent's supposed "mistake" was about the effect of California law on the *intestacy* rights of adopted-out children, not about any "specific terms of the document" as contemplated by the Restatement proposal.

Scott demonstrates no basis for reformation.

### 3.

Scott concludes in part: "It would be a manifest injustice if Haskell's estate were distributed in any part to the Battles when he truly intended the exact opposite." The intestacy laws by their nature will defeat many "true" intentions. Decedent could have prevented such "injustice," if any, by making a new will, or by including in the first will language stating his wishes if Eleanor died first. The objectors have not caused an injustice by invoking applicable law.

In a factually similar case, decided under the old law, the court observed: "It may be that testatrix would have preferred [a different disposition]. We are interpreting a statute, however, and not construing an ambiguous will. In doing this, we must have in mind consequences that transcend the individual case. In any particular case, a testator may do as he pleases, subject to but few limitations. He can avoid the necessity for use of the antilapse statute. [¶] The statutes operate impersonally. An adoptee shares in the estate of his intestate adoptive relatives, whether they would have wished it or not. He does not succeed to the estate of natural relatives, whether they would have desired it or not." (*Estate of Goulart, supra,* 222 Cal.App.2d at p. 824.) Here, decedent's heirs must be determined under the current intestacy laws, whether he "would have wished it or not."

The California Supreme Court recently decided a probate case which bears on this last point. In *Estate of Griswold* (2001) 25 Cal.4th 904 [108 Cal.Rptr.2d 165, 24 P.3d 1191], the decedent died intestate and application of the intestacy laws resulted in part of the estate passing to his natural (but illegitimate) father's children (i.e., his half siblings). The decedent's father had acknowledged paternity over the decedent and paid some child support in the distant past. "Although the father and the out-of-wedlock child apparently never met or communicated, and the half siblings did not learn of the child's existence until after both the child and the father died," (25 Cal.4th at p. 907) the half siblings were entitled to share in the estate by application of a particular statute. Such result might seem unfair. (See, e.g., *id.* at p. 925 (conc. opn. of Brown, J.) ["I believe our holding today contravenes the overarching purpose behind our laws of intestate succession—to carry out 'the intent a decedent without a will is most likely to have had.' "].) But as the majority opinion emphasized, succession is a legislative matter: "While the Legislature remains free to reconsider the matter and may choose to change the rules of succession at any time, this court will not do so under the pretense of interpretation." (*Id.* at p. 924.) So, too, here.

### III.

Scott contends decedent's gift to Eleanor did not lapse. Decedent left all of his property "to my wife, Eleanor M. Dye, to be her sole and separate property." Eleanor predeceased him. Therefore, when he died, it had lapsed, meaning, it was of no force, because the recipient did not exist.

Generally, a "transferee" is a "beneficiary . . . or other recipient of an interest transferred by an instrument." (§ 81.5.) Generally, unless the antilapse statute applies, when a transferee predeceases the decedent, she or he "does not take under the instrument." (§ 21109, subd. (a).) When a transfer

fails, "the property transferred becomes a part of the residue transferred under the instrument." (§ 21111, subd. (a).) Where, as here, the disposition of the residuum is not specified, it is subject to disposition as by intestacy: "Any part of the estate of a decedent not effectively disposed of by will passes to the decedent's heirs as prescribed in this part [governing intestate succession.]" (§ 6400.)

■ Scott points to an "antilapse" statute, section 21110, which partly provides: "(a) Subject to subdivision (b), if a transferee . . . fails to survive the transferor . . . the issue of the deceased transferee take in the transferee's place in the manner provided in Section 240. . . . [¶] (b) The issue of a deceased transferee do not take in the transferee's place if the instrument expresses a contrary intention or a substitute disposition. . . . [¶] (c) As used in this section, 'transferee' means a person who is kindred of the transferor or kindred of a surviving, deceased, or former spouse of the transferor."

The trial court ruled "Eleanor does not qualify as a 'transferee' as that term is defined in . . . section 21110(c). Therefore, the anti-lapse statute is not applicable in this situation." We agree with the trial court.

As stated above, the general definition of "transferee" in the Probate Code includes any beneficiary. (§ 81.5.) However, section 21110, sets forth a special definition: "As used in this section, 'transferee' means a person who is kindred of the transferor or kindred of a surviving, deceased, or former spouse of the transferor." (§ 21110, subd. (c).) This legislative desire to cabin the antilapse statute must be given effect. Eleanor was not *kin* to decedent, she was *married* to him.

The antilapse statutes and decisions vary widely. (See, e.g., 23A Words and Phrases (West 1967 & supp.) Kindred, pp. 435-439; Kimbrough, *Lapsing of Testamentary Gifts, Antilapse Statutes, and the Expansion of Uniform Probate Code Antilapse Protection* (1994) 36 Wm. & Mary L.Rev. 269; French, *Antilapse Statutes Are Blunt Instruments: A Blueprint for Reform* (1985) 37 Hastings L.J. 335.) But in California, as in the common law generally, "kindred" requires consanguinity, not merely affinity.

Beginning with the first year of statehood, California's antilapse statute spoke in terms of a devise to "any child, or other relation of the testator." (Stats. 1850, ch. 72, § 20, p. 179.) The term "relation" excluded a spouse. (*Estate of Pfuelb* (1874) 48 Cal. 643, 644-645; *Estate of Sowash, supra,* 62 Cal.App. at p. 516 ["Lexicographers have defined it as signifying a relation in general so as to include relationship by blood or affinity. . . . But . . .

when courts have been called upon to determine whether a wife is a 'relative' under statutes preventing lapse, they have by a uniform course of decisions held that the term includes only relationship by blood, and that a husband, therefore, is not a relative of his wife, nor a wife a relative of her husband"]; *Estate of Crane* (1892) 2 Coffey's Prob. Dec. pp. 535, 537; see *In re Estate of Renton* (1895) 10 Wash. 533, 538-539 [39 P. 145, 147] [statute which spoke of "child, grandchild or other relative" did not include wife]; *Esty v. Clarke* (1869) 101 Mass. 36 [3 Am. Rep. 320] [statute virtually identical to California former statute did not include spouse].)

Former Civil Code section 1310 also used the term "relation"; then the antilapse provision became Probate Code former section 92, which spoke of "any kindred of the testator." (Stats. 1931, ch. 281, § 92, p. 592; *Estate of Carroll* (1956) 138 Cal.App.2d 363, 365 [291 P.2d 976].) But there is no difference between "relation" and "kindred" as those terms are used in these statutes.

First, the primary dictionary definition of "kindred" is "The being of kin; relationship by blood or descent (occasionally, *but incorrectly*, by marriage); kinship." (Oxford English Dict. (2d ed. CD-ROM 1994), italics added; see Black's Law Dict. (7th ed. 1999) p. 874 ["kin" means "relat[ed] by blood, marriage, or adoption, though usu[ally] by blood only"].)

Second, "kindred," or "next of kin" was viewed as a synonym for "relation," and also excluded spouses at common law, in will cases. (*Lord v. Bourne* (1873) 63 Me. 368 [18 Am. Rep. 234] ["A devise or bequest to next of kin vests the property in the persons (exclusive of the widow) who would take the personal estate in case of intestacy"]; *Matter of Devoe* (1902) 171 N.Y. 281, 283 [63 N.E. 1102, 1103] ["in its primary meaning the term 'next of kin' includes neither a widow nor a husband"]; cf. *French v. French* (1892) 84 Iowa 655 [51 N.W. 145, 146] ["Primarily the word 'kin' includes only . . . relationship by blood or consanguinity; and the term 'next of kin' would not, by that rule, include a widow"; but held: widow could invoke protections of deadman's statute].) This widespread understanding of the terms "kin" and "relation" at common law is significant.

We disagree with the rationale expressed in some early cases that the definition of these terms depends on the now repudiated notion that a woman loses her identity upon marriage. A typical case is *Storer v. Wheatley's Executor* (1845) 1 Pa. [1 Barr.] 506, 507, which stated: "[A] wife is not related to her husband in any respect. . . . [H]er civil existence is melted into his, and they together form one person. A wife is therefore no more a relation . . . of her husband than [he] is . . . of himself." At least one later

Pennsylvania case gave the author of *Storer* a backhanded compliment: "A reason for this doctrine is given by Chief Justice Gibson, which shows that he would have been no mean antagonist in a scholastic disputation in the middle ages. . . . [¶] It is probably not necessary, for the purposes of this case, to inquire how far the premises upon which Chief Justice Gibson's reasoning was based have been modified by the married women's property Acts." (*Commonwealth v. Metz* (1896) 2 Dauph. 360 [5 Pa.D. 301, 17 Pa.C.C. 541]; and see *Esty v. Clarke, supra,* 101 Mass. 36 [declining to adopt *Storer's* rationale].) But, we need not reject a sound, long-standing definition, because some courts attribute a faulty reason for it.

Third, the leading California treatises interpret "kindred" to exclude spouses. (12 Witkin, Summary of Cal. Law, *supra,* Wills and Probate, § 326, p. 361 ["The term 'kindred' calls for *blood* relationship"]; Ross & Moore, Cal. Practice Guide: Probate (The Rutter Group 2000) ¶ 16:450, p. 16-116.2 to 16-116-3 (rev. #1, 1997) [kindred means "blood relative or relative by adoption"]; 2 Goddard, Cal. Practice: Probate Court (3d ed. 1977) Testacy, § 1591, p. 507.) ■ The practice of the bar is a good indication of a statute's meaning, particularly where, as here, there has been legislative acquiescence. (See *Parker v. Walker* (1992) 5 Cal.App.4th 1173, 1183-1184 [6 Cal.Rptr.2d 908] [probate case].)

Finally, in *Estate of Roberts* (1948) 85 Cal.App.2d 609, 612-617 [194 P.2d 28], former Presiding Justice Annette Abbott Adams of this court reviewed a number of authorities on this subject and concluded the term "kin" required a blood relationship, albeit in a slightly different context.

■ Even Scott concedes "the term kindred historically has had a more limited meaning," than the one he tenders. Scott argues the use of "kindred" reflects a legislative intention to broaden the reach of the antilapse statute. Although the current antilapse statute may reach more broadly than the former statute in some ways, we do not agree that it extends to spouses. As stated above, the terms "kindred" or "kin" have long excluded spouses. "When the Legislature uses language which has received definitive judicial construction we presume it intended to adopt that construction." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1107 [1 Cal.Rptr.2d 222].) So it is here.

Scott points to section 21114, which provides that a testamentary gift to "next of kin" (or "heirs," "family," or "relatives") is presumed to designate a person's heirs. He reasons that since a *surviving* spouse is an "heir," this reflects a legislative intent to included spouses within the term "kindred" as used in the antilapse statute. We disagree. Section 21114 does not purport to define "kindred" for purposes of any Probate Code sections, it clarifies how courts should ordinarily interpret certain terms often used in wills.

■ Scott points to comments to a tentative legislative proposal, contained in a motion for judicial notice. The document is entitled "Sixth Supplement to Memorandum 82-70: Subject: Study L-625—Probate Code (Tentative Recommendation—Wills Generally . . . .)" It was apparently located in the legislative bill file that resulted in former section 6147, a precursor of the current statute. (Stats. 1983, ch. 842, § 55, p. 3053.) The author is not given and therefore the document lacks foundation, and we deny the request for judicial notice. In any event, the proposed statute (numbered § 204.050) read in part: "If a devisee is dead . . . the issue of the deceased devisee . . . take in place of the deceased devisee . . . ." The commentary observes California law limits the antilapse protections to " 'kindred' of the testator—that is, related to the testator by blood," and explains the proposed "more liberal rule permits the children of the spouse or the testator to take a gift given by will to the spouse if the spouse dies before the testator." We agree with Scott that *if* the proposed language were the law, he would prevail. But the Legislature enacted *different* language, therefore the commentary relied on by Scott is not helpful. In fact, it undercuts his position because it acknowledges the meaning of "kindred" in California, prior to the Probate Code revision which ultimately took place, excluded spouses. This illustrates the danger of uncritical reliance on pieces of "legislative history" contained in a bill file.

A different proposed version of the statute, with a known and venerable provenance, would have provided "If a devisee who is kindred of the testator is dead," the gift would not lapse, and a comment states this version "continues the provisions of former Section 92 that applies the anti-lapse provisions whenever the deceased divisee is 'kindred' of the testator—that is, related to the testator by blood." (Tentative Recommendation Relating to Wills and Intestate Succession (Nov. 1982) 16 Cal. Law Revision Com. Rep. (1982) p. 2402.) In some cases a Law Revision Commission comment may be used to illuminate the meaning of a statute. (See *Estate of Joseph* (1998) 17 Cal.4th 203, 210, fn. 1 [70 Cal.Rptr.2d 619, 949 P.2d 472].) This comment shows that during this period of revision of the probate statutes, the Legislature knew exactly what the "kindred" limitation meant. The statute it *did* adopt contains virtually the same language as the current statute, speaking in terms of "a devisee who is kindred of the testator or kindred of a surviving, deceased, or former spouse of the testator." (Former § 6147, subd. (a), added by Stats. 1983, ch. 842, § 55, p. 3053.) A Law Revision Commission comment points out "The term 'kindred' was taken from former . . . Section 92 . . . and refers to persons related by blood." (Cal. Law Revision Com. com., 53 West's Ann. Prob. Code (1991 ed.) foll. § 6147, p. 315.) Thus, the Legislature was aware of and chose to retain the blood kinship requirement. That policy choice is not ours to make.

"It has been said that it will be assumed that testator had [an antilapse] statute in mind when he drew his will." (6 Page on Wills (1962) Lapsed and Void Devises and Legacies, § 50.11, pp. 82-83 [citing, inter alia, *Estate of Carroll, supra,* 138 Cal.App.2d 363].) "[T]he court is bound to read into the will [an antilapse statute]. [Citations.] There can be no question but that the intention of the testator controls but to render the statute inoperative a contrary intent on the part of the testator must be plainly indicated." (*Estate of Steidl* (1948) 89 Cal.App.2d 488, 490 [201 P.2d 58]; see *Estate of Murphy* (1935) 9 Cal.App. 712, 713-714 [100 P. 711].) The will discloses no intention to preserve the gift to Eleanor for Scott.

## IV.

 Decedent left a will with a single gift, which lapsed. The residuum (the entire estate) must pass as by intestacy, meaning decedent's children take in equal shares. As we have explained, decedent had three children, Scott, Phillip Joe, and Jimmie Dean (deceased, with living issue). On this record, the estate must be divided into thirds, with each child entitled to an equal share, Jimmie Dean's children taking his share.

### DISPOSITION

The order granting the heirship petition is affirmed.

Raye, Acting P. J., and Hull, J., concurred.