[Cite as *Dispatch Printing Co. v. Recovery Ltd. Partnership*, 2015-Ohio-381.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The Dispatch Printing Co. et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 14AP-473<br>(C.P.C. No. 05CV-4220) |
| Recovery Limited Partnership et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| (California Gold Marketing Group, LLC, | : | |
| Appellant). | : | |
| The Dispatch Printing Co. et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 14AP-474<br>(C.P.C. No. 06CV-4469) |
| Gilman D. Kirk et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| (California Gold Marketing Group, LLC, | : | |
| Appellant). | : | |
| Michael H. Williamson et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 14AP-475<br>(C.P.C. No. 05CV-11795) |
| Recovery Limited Partnership et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| (California Gold Marketing Group, LLC, | : | |
| Appellant). | : | |

D E C I S I O N

Rendered on February 3, 2015

*Kushner & Hamed Co., LPA, Philip S. Kushner, Michael R. Hamed* and *Christian J. Grostic,* for appellee receiver Ira Owen Kane.

*James E. Arnold & Assocs., LPA, James E. Arnold, Gerhardt A. Gosnell II, and Damion M. Clifford; Rutan & Tucker, LLP, Richard K. Howell* and *Caroline R. Djang,* for appellant.

APPEALS from the Franklin County Court of Common Pleas

CONNOR, P.J.

{¶ 1}  Appellant, California Gold Marketing Group, LLC ("California Gold"), appeals from a judgment of the Franklin County Court of Common Pleas sustaining the motion of appellee, Ira O. Kane, in his capacity as the receiver for Columbus Exploration, LLC ("Columbus Exploration") and Recovery Limited Partnership ("RLP"), to repudiate the exclusive marketing contract entered into between RLP and California Gold. California Gold assigns the following sole assignment of error for our review:

> The Court of Common Pleas, Franklin County Ohio (the "Trial Court") erred in sustaining the Appellee-Receiver's Motion to Repudiate Contract with Appellant California Gold Marketing Group, LLC.

{¶ 2}  Because the trial court abused its discretion in granting the receiver's motion to repudiate, we reverse.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 3}  These consolidated cases concern two Ohio businesses, Columbus Exploration and RLP, which are currently in receivership. The events which brought these companies to their current state of financial crisis began in 1977, when Thomas G. Thompson, a researcher at the Battelle Memorial Institute in Columbus, Ohio, began

researching deep ocean shipwrecks and the methods and technologies for locating them. Thompson became interested in attempting to recover the *S.S. Central America*, a United States mail steam-ship that sank off the coast of South Carolina on September 12, 1857 during a hurricane. The *S.S. Central America* was carrying several tons of gold from the California gold rush when it sank.

{¶ 4} In the mid-1980s, Thompson organized RLP to fund the search-and-recovery project. Thompson sought, and obtained, investments for the recovery project from several central Ohio businesses, including the Dispatch Printing Co. From 1986 to 1992, Thompson, along with a team, found and recovered portions of the *S.S. Central America*. Thompson and his team were able to recover more than a ton of gold and silver, as well as numerous artifacts from the shipwreck. Although this initial recovery was substantial, another ton of gold and silver still remained on the ocean floor. In 1987, Thompson organized Columbus-America Discovery Group, Inc. ("CADG") to act as RLP's "agent with respect to the management of the Partnership's business, the conduct of recovery operations, and legal proceedings and press relations incidental thereto." (Motion to Substitute, exhibit A, Agency Agreement.)

{¶ 5} Upon discovering the *S.S. Central America*, Thompson initiated an admiralty action in the United States District Court for the Eastern District of Virginia to establish ownership of the shipwreck and all of its contents. The federal court held that CADG, as RLP's agent, owned 92.5 percent of the salvage rights to the *S.S. Central America*. The federal court awarded 7.5 percent of the salvage rights to several insurance companies who established that their predecessors had insured certain portions of the gold on board the *S.S. Central America* when it sank.

{¶ 6} Although there are several aspects to the litigation surrounding the receivership entities, we will focus on the facts which are most relevant to the instant appeal. Particularly important to the instant case are two contracts entered into by CADG and RLP in the late 1990s. In 1998, CADG entered into a contract with California Gold (the "1998 Agreement"), whereby the parties defined the terms and conditions under which California Gold would purchase the portion of the treasure which CADG had already recovered from the *S.S. Central America* (the "Up treasure"). Section 1 of the 1998 Agreement noted that Christie's International PLC held a lien against the Up treasure,

that California Gold had offered to pay $36 million for the Up treasure, and that California Gold would use the offer money to obtain "a release of Christie's entire right, title, claim and interest, of any kind, in the Recovered Gold Collectibles [i.e. the Up treasure]." (1998 Agreement, Section 1(b).)

{¶ 7}   In Section 2 of the 1998 Agreement, CADG granted to California Gold "the exclusive right to market any gold and silver coins and numismatic items (including, without limitation, bars) [CADG] * * * recover[s] and own[s], or ha[s] the legal right to market, from the *SS Central America* at any time following the date of this Agreement (the 'Other Gold Collectibles')." (1998 Agreement, Section 2, referred to herein as the "marketing contract".) "Other Gold Collectibles" thus described the other ton of treasure which remained on the ocean floor at the time the parties entered into the 1998 Agreement (the "Down treasure"). Section 2 of the 1998 Agreement also set forth the commission California Gold would receive for each item of Down treasure it successfully marketed and sold. The agreement stated that, if California Gold was successful in purchasing the Up treasure, its commission for the sale of an item of the Down treasure would be five percent of the bullion/melt value of the item sold plus 20 percent of the amount by which the sale price exceeded the bullion/melt value. The 1998 Agreement was later amended to add RLP as a party to the agreement.

{¶ 8}   In 1999, CADG, RLP, and California Gold entered into an Asset Purchase Agreement, whereby California Gold purchased the Up treasure from CADG and RLP (the "1999 Agreement"). In the recitals section of the 1999 Agreement the parties stated that the 1998 Agreement had expired, that the 1999 Agreement concerned "only" the Up treasure "and supercede[d] all prior agreements concerning the" Up treasure, and that the provisions of the 1998 Agreement "which concern[ed] solely the [Down treasure]" would "continue to survive" and would be "made a part of" the 1999 Agreement. (Recital B, 1999 Agreement.) The remainder of the 1999 Agreement detailed the terms and conditions by which California Gold would purchase the Up treasure.

{¶ 9}   Following the 1999 Agreement, California Gold exhibited and marketed the Up treasure for sale. It conducted an impressive marketing campaign which included, among other promotional endeavors, producing a documentary regarding the shipwreck which aired on the History Channel, publishing a book titled *A California Gold Rush*

*History*, constructing a 40-foot replica of the *S.S. Central America* which toured the United States, and creating a museum exhibit titled *Gold! Gold!* which toured museums world wide and featured the 80 pound Eureka Bar from the *S.S. Central America*, the largest and heaviest gold numismatic item known to exist. As a result of its extensive marketing campaign, California Gold achieved "exponential sale price[s] over the melt value of [the] gold." (Memo in Opposition to Motion to Repudiate, 13.)

{¶ 10} In 2005, the Dispatch Printing Co. and Donald C. Fanta filed separate actions against the directors of Columbus Exploration and the partners of RLP. The plaintiffs noted that Thompson had organized Columbus Exploration in the late 1990s to take over from RLP the recovery and marketing of the treasure. RLP's partners were granted ownership interests in Columbus Exploration based on their respective ownership interests in RLP. The complaints alleged that the companies had not provided their investors with any return on their investments, and further alleged that the businesses were refusing to provide the investors with any financial information regarding the businesses.

{¶ 11} The plaintiffs eventually filed a motion asking the court to appoint a receiver for Columbus Exploration and RLP. On June 14, 2013, the court granted the motion and issued an entry appointing a receiver for Columbus Exploration and RLP. In the entry, the court found the appointment of a receiver necessary, as RLP and Columbus Exploration were in a state "of great disarray and insolvency, coupled with a lack of functional management." (Entry Appointing Receiver, 2.) The court appointed Mr. Kane to serve as receiver for the two entities. The court stated that the receiver's powers would be derived from R.C. 2735.04 generally, as well as Loc.R. 66 of the Franklin County Court of Common Pleas, and Ohio common law.

{¶ 12} On June 20, 2013, the receiver accepted his appointment. On September 30, 2013, the receiver applied to the court for approval of the receiver's initial receivership plan and report, which the court ultimately approved. In the plan, the receiver stated that the ultimate goal of the receivership was "the recovery, conservation and successful monetization of the Down Treasure." (Receiver's Initial Receivership Plan and Report, 2.) The receiver also noted in the plan that "[e]xecutory contractual obligations will be reviewed by the Receiver to determine whether such

contractual obligations are unprofitable or undesirable and, based on that determination, to affirm or repudiate such agreements accordingly, subject to the approval of the Court." (Receiver's Initial Receivership Plan and Report, 11.)

{¶ 13} On November 20, 2013, the receiver sent a letter to California Gold's president, Dwight Manley, asking California Gold to submit a proof of any claim it may have against the receivership entities. On January 3, 2014, California Gold responded to the receiver's request, and asserted that it had a claim based on its "rights to market the down treasure." (Motion to Repudiate, exhibit A.)

{¶ 14} On March 14, 2014, the receiver filed a motion to repudiate the marketing contract with California Gold. The receiver asserted that the marketing contract was an executory contract which was undesirable for the receivership entities, as the marketing contract gave the receivership entities "no control whatsoever with regard to the marketing of the Down Treasure." (Receiver's Motion to Repudiate, 6.) Accordingly, the receiver argued that the marketing contract was not in the best interests of the receivership entities, and should therefore be rejected.

{¶ 15} On April 15, 2014, California Gold filed a memorandum in opposition to the receiver's motion to repudiate. California Gold asserted that the marketing contract was not executory, as California Gold had already substantially performed its obligations under the marketing contract. California Gold asserted that its previous marketing campaign served "to enhance the prestige and value of both the Up and Down Treasure." (Memo in Opposition, 8.) California Gold also noted that the receiver had failed to present evidence indicating that rejection of the marketing contract would benefit the receivership estate. California Gold asserted that, as repudiation of the marketing contract would give California Gold a claim for breach of contract, the damages which would result from such a claim could potentially "exceed the amount realized by the Receiver's monetization of the remaining Receivership Estate assets, especially after paying professionals and commissions." (Memo in Opposition, 3.)

{¶ 16} California Gold asserted that, in light of its previous expenditures and its experience in marketing the treasure, the receiver's desire to replace California Gold with another marketing agent was contrary to the receiver's duty to maximize the value of the estate. California Gold attached several affidavits to its memorandum in

opposition from individuals in the numismatic community, all praising the job California Gold did in marketing and selling the Up treasure.[1] California Gold also noted that, as it was simply the exclusive marketing agent for the Down treasure, the receiver, as the owner of the Down treasure, retained full "control over the Down Treasure," including control over "when to sell, whether to sell or not to sell, at what price to sell, and whether to accept or reject offers for sale of the Down Treasure." (Memo in Opposition, 5.)

{¶ 17} On April 24, 2014, the receiver filed a memorandum in support of his motion to repudiate the marketing contract. The receiver quoted from Recital C of the 1999 Asset Purchase Agreement, which stated that California Gold would market the treasure "in a diligent, professional and dignified manner consist [sic] with the scientific and historical significance of the Central America project," but further stated that California Gold would have the "power to manage the marketing of the Treasure in its sole and absolute discretion and without any liability or obligation to the Seller or any other person." (Recital C of the 1999 Agreement.) As the receiver believed Recital C applied to the marketing of the Down treasure, the receiver asserted that the marketing contract was undesirable because California Gold would be immune from liability for its actions under the marketing contract. The receiver also asserted that, as Recital B of the 1999 Agreement incorporated only the provisions of the 1998 Agreement which concerned solely the Down treasure, the fiduciary obligations and indemnification provisions contained in the 1998 Agreement were not incorporated by reference into the 1999 Agreement. (*See* 1998 Agreement, Sections 3 and 4.)

{¶ 18} The court informed the parties that it would accept additional briefing on the repudiation issue. Accordingly, on May 12, 2014, California Gold filed a supplemental memorandum in opposition to the receiver's motion to repudiate.

---

[1] For instance, Adam Crum, the vice president of numismatics at Monaco Rare Coins, an entity which purchased a large portion of the Up treasure, averred that he had witnessed California Gold's "sensational and extremely well-received marketing efforts" regarding the Up treasure, and stated that he had "profound concerns if the marketing of the remaining Treasure is turned over to another entity other than [California Gold] and Dwight Manley." (Crum Affidavit, ¶ 10-11.) Similarly, David Hall, an expert in the field of numismatics and the founder of Professional Coin Grading Service, averred that the California Gold's marketing of the Up treasure was "the greatest marketing job that I have ever seen in the history of numismatics," and stated that replacing California Gold with another marketing agent "would be a costly mistake." (Hall Affidavit, ¶ 13, 15.)

California Gold asserted that the receiver's reliance on the recitals of the 1999 Agreement was misplaced, as Recital B of the 1999 Agreement stated that the 1999 Agreement "concern[ed] only the [Up treasure]." (Recital B of the 1999 Agreement.) Accordingly, California Gold asserted that the limitation of liability in Recital C of the 1999 Agreement applied only to California Gold's marketing of the Up treasure. California Gold noted that the liability disclaimer was placed in Recital C because a purchaser of assets "would not typically have any liability or obligation to the seller of such assets with respect to the marketing of those assets because the seller no longer owns the assets." (Supplemental Memo in Opposition, 6.) California Gold supported its supplemental memorandum with the affidavit of Dwight Manley.

{¶ 19} On May 15, 2014, the receiver filed a response to California Gold's supplemental memorandum. The receiver asserted that Recital A of the 1999 Agreement defined "Treasure" to mean "the gold and silver 'that CADG has recovered, and intends to recover, from the *SS Central America*.' " (Receiver's response, 3.) Accordingly, the receiver asserted that the limitation of liability in Recital C applied to both the Up and Down portions of the treasure.

{¶ 20} On May 19, 2014, the trial court issued a Decision and Entry sustaining the receiver's motion to repudiate the marketing contract with California Gold. The court noted that the motion to repudiate depended on two questions: (1) whether the contract was executory, and (2) whether, in the receiver's opinion, it would be unprofitable or undesirable to adopt the contract. The court found the marketing contract to be "wholly executory," as it was "a contract by which a party agrees to do * * * something in the future." (Decision, 3.) The court then found, without analysis, that Recital C applied to the Down treasure. The court noted that the phrase sole and absolute discretion in Recital C, was "a very clear and unambiguous statement of authority, and, therefore, this Court has to conclude that the Receiver would have *no* recourse in the event that [California Gold] did not act in the best interests of the Receiver." (Emphasis sic.) (Decision, 4.) The court stated that Recital C effectively removed from the receiver "the ability to use his best judgment as to what shall be done with any recovered Down Treasure." (Decision, 4.) Accordingly, the court concluded that the contract was executory and that the receiver was within his rights to repudiate the contract.

{¶ 21} After sustaining the motion, the court stated that it felt compelled to "make a few comments." (Decision, 5.) The court initially stated that the law was "clear that where a receiver repudiates an executory contract, the affected party may file * * * a claim with the receiver." (Decision, 5.) The court observed that "[t]hat claim, in this case, has the potential to be very large indeed." (Decision, 5.) The court also noted that, based on the evidence in the record, it appeared that California Gold "did an exceptional job in handling, conserving, marketing, selling, etc., the Up Treasure," and that such work "should not be cavalierly disregarded or ignored." (Decision, 5.) The court concluded its "comments" by recognizing the "exceptional job" California Gold had done in marketing the Up treasure, and stated "[i]t may very well be in the best interests of the Receiver and those for whom he labors * * * that he continue to work with [California Gold]." (Decision, 6.)

## II. TRIAL COURT ERRED IN SUSTAINING THE RECEIVER'S MOTION TO REPUDIATE MARKETING CONTRACT

{¶ 22} California Gold asserts that the trial court applied an incorrect standard of review to determine whether the receiver could repudiate the marketing contract, as the trial court failed to determine whether repudiation would benefit the receivership estate. California Gold also contends that the marketing contract is not an executory contract subject to repudiation. Finally, California Gold asserts that the limitation of liability in Recital C of the 1999 Agreement applied only to the Up treasure, and thus did not apply to the marketing contract.

A. *Standard of Review*

{¶ 23} A "receiver" is " 'a trustee or ministerial officer representing the court,' " who is " 'appointed by the court to receive and preserve the property or fund in litigation, and receive its rents, issues, profits, and apply or dispose of them at the direction of the court.' " *State ex rel. Celebrezze v. Gibbs*, 60 Ohio St.3d 69, 74 (1991), fn. 4, quoting *Black's Law Dictionary* 1268 (6 Ed.1990). A trial court has discretion to appoint a receiver. *Norris v. Dudley*, 10th Dist. No. 07AP-425, 2007-Ohio-6646, ¶ 19. R.C. 2735.01 provides that a common pleas court may appoint a receiver when a company is in imminent danger of insolvency or has forfeited its corporate rights. R.C. 2735.01(E). "Under the control of the court which appointed him," a receiver has the

power to "bring and defend actions in his own name as receiver, take and keep possession of property, receive rents, collect, compound for, and compromise demands, make transfers, and generally do such acts respecting the property as the court authorizes." R.C. 2735.04.[2]

{¶ 24} The Supreme Court of Ohio has interpreted R.C. 2735.04 "as enabling the trial court to exercise its sound judicial discretion to limit or expand a receiver's powers as it deems appropriate." *Celebrezze* at 74. "R.C. Chapter 2735 does not contain any restrictions on what the court may authorize when it issues orders regarding receivership property." *Quill v. Troutman Ent., Inc.,* 2d Dist. No. 20536, 2005-Ohio-2020, ¶ 34. "[A]n appellate court will not disturb a trial court's judgment regarding a receiver's powers absent a showing of an abuse of discretion." *Campbell Investors v. TPSS Acquisition Corp.,* 152 Ohio App.3d 218 (6th Dist.2003), ¶ 34, citing *Celebrezze* at 73-74.

{¶ 25} Under this standard, the trial court does have "a duty to independently monitor and evaluate the Receiver's conduct in relation to the duties the Receiver owed the parties and the assets under their control." *Fifth Third Bank v. Q.W.V. Properties, LLC,* 12th Dist. No. CA2010-09-245, 2011-Ohio-4341, ¶ 19. *See also Hummer v. Hummer,* 8th Dist. No. 96132, 2011-Ohio-3767, ¶ 18 (noting that "[w]hile there are no limits on the powers that may be given, a receiver's authority is not unbridled," as the receiver is subject to the court's order and direction). The receiver's purpose is to carry out the orders of the appointing court, "for the 'appointing court defines the powers of the receiver and, therefore, controls his actions.' " *Park Natl. Bank v. Cattani, Inc.,* 187 Ohio App.3d 186, 2010-Ohio-1291 (12th Dist.), ¶ 10, quoting *Javitch v. First Union Secs., Inc.,* 315 F.3d 619, 626 (6th Cir.2003).

{¶ 26} In the order appointing the receiver, the court obligated the receiver to "make every effort to further the corporate goal of [Columbus Exploration], which [was] to use the technology and inventions developed by RLP and conduct such maritime operations that are designed to make a positive financial return for the companies." (Entry Appointing the Receiver, 2.) The court further stated that the receiver would

---

[2] R.C. 2735.04 was amended on December 19, 2014 by Am.Sub.H.B. No. 9. The amendments do not affect this case.

"have wide authority to achieve this goal," and that he would have "full control over the assets of the Companies in order to accomplish the purposes of this Receivership." (Entry Appointing the Receiver, 2, 4.)

{¶ 27} California Gold asserts that the trial court applied the incorrect standard for determining whether the receiver could reject the contract at issue. An Ohio receiver " 'is not bound to adopt the contracts * * * or otherwise step into the shoes of the assignor, if in his opinion it would be unprofitable or undesirable to do so.' " *Norris* at ¶ 23, quoting *United States Trust Co. v. Wabash W. Ry. Co.*, 150 U.S. 287, 299 (1893). *See also* 80 Ohio Jurisprudence 3d, Receivers, Section 134 (similarly stating that, in Ohio, "[a] receiver is not bound to adopt the executory contracts * * * if, in the receiver's opinion, it would be unprofitable or undesirable to do so"). In *Dissolution of Charles F. Johnson, Inc.*, 22 Ohio Law Abs. 534 (2d Dist.1936) (Franklin County) this court similarly held that the " ' general rule is undisputed that a receiver is not bound to adopt or perform executory contracts, or otherwise step into the shoes of the person for whom he is appointed receiver, if, in his opinion, it would be unprofitable or undesirable to do so.' " *Id.*, quoting 34 Ohio Jurisprudence 1020.

{¶ 28} Despite the foregoing authority, California Gold asserts, relying on *Norris*, that, under the proper standard of review, a trial court must ascertain "the benefits and risks to the receivership estate posed by the repudiation of the Contract." (Appellant's brief, 41.) As noted above, however, *Norris* upheld the general proposition that a receiver may reject an executory contract if, in the receiver's opinion, the contract is unprofitable or undesirable.

{¶ 29} Although California Gold asserts that "numerous executory contract cases stand for the proposition that a party seeking rejection of an executory contract must show * * * that rejection of the executory contract 'will likely **benefit** the estate,' " the cases California Gold relies on to support its contention all concern proceedings in bankruptcy, not Ohio receiverships. (Emphasis sic.) (Appellant's brief, 39.) *See In re Sun City Invest., Inc.*, 89 B.R. 245, 248-249 (Bankr.M.D.Fla. 1988) (noting that the "decision to assume or reject an executory contract is left entirely to the debtor" in bankruptcy, and that the court will approve the debtor's decision "subject only to review under the business judgment rule" which requires "a showing by the Trustee or debtor-

in-possession that rejection of the contract will likely benefit the estate"); *In re Prestige Motorcar Gallery, Inc.*, 456 B.R. 541, 544-45 (Bankr.N.D.Fla. 2011) (noting that "the threshold requirement and burden of the trustee is to produce credible evidence that his decision to assume or reject would benefit the estate or result in a successful reorganization").

{¶ 30} Although the business judgment rule from the bankruptcy context is not applicable to an Ohio receiver, we note that the receiver herein was obligated to always act "in the best interests of the estate." Loc.R. 66.04(C)(6). Indeed, when Mr. Kane accepted his appointment as receiver, he acknowledged in writing that he would "act in the best interests of the receivership." (Receiver's Acceptance of Appointment, 1.) Accordingly, when a receiver identifies an executory contract which the receiver finds undesirable or unprofitable, the receiver is not at liberty to reject the contract unless rejection is also in the best interests of the receivership estate.

{¶ 31} Here, the receiver has only argued that the marketing contract was undesirable and has never contended that the contract was unprofitable. The trial court concluded that the receiver was " within his rights to repudiate the contract" because the limitation of liability in Recital C of the 1999 Agreement would effectively leave the "entire handling of the Down Treasure to the unfettered and unregulated discretion of [California Gold]." (Decision, 4). Thus, the trial court found the marketing contract to limit the discretion of the receiver.

B. *Executory Contract*

{¶ 32} In *Dissolution of Charles F. Johnson, Inc.,* the court stated that " '[a]n executory contract is one in which a party binds himself to do or not to do a particular thing in the future.' " *Id.*, quoting 13 Ohio Jurisprudence 245. In *Norris,* this court noted that *Black's Law Dictionary* 321 (7th Ed.1999) defined an executory contract as " '[a] contract that remains wholly unperformed or for which there remains something still to be done on both sides, often as a component of a larger transaction.' " *Norris* at ¶ 31, quoting *Black's Law Dictionary*. The *Norris* court also noted that the Supreme Court of Ohio had defined an executory contract as " 'one in which a party binds himself to do, or not to do, a particular thing, whereas an executed contract is one in which the object of

the agreement is performed and everything that was to be done is done.' " *Norris* at ¶ 31, quoting *Cassella v. Tiberio*, 150 Ohio St. 27, 30 (1948).

{¶ 33} In *Norris,* the court concluded that the lease at issue therein did not fit neatly into any of these definitions. The court analyzed the facts of the case and concluded that "both parties had performed their substantial obligations under the contract," as "Who Land LLC [lessor/party in receivership] granted a 50-year lease for a limited use of the 20-foot by 80-foot property, and the Fees [lessees] paid for that limited use as part of the property sale." *Id.* at ¶ 33. Although other, non-substantial obligations had not yet expired under the 50-year lease, because the parties had performed their substantial obligations under the lease, the *Norris* court held that the lease "was not an executory contract the receiver was free to reject." *Id.* at ¶ 33. *See also Dissolution of Charles F. Johnson, Inc.* (holding that a contract was executory "in part, at least," as it "required the payment of the $124,000 by the corporation" in the future).

{¶ 34} California Gold asserts that the marketing contract is not executory because California Gold "made considerable expenditures in marketing and promoting both the Up and Down" portions of the treasure during its previous marketing campaign. (Appellant's brief, 48.) Although we agree that California Gold's previous marketing campaign served in some respects to market the treasure from the *S.S. Central America* as a whole, the previous marketing campaign did not satisfy California Gold's substantial obligations under the marketing contract for the Down treasure.

{¶ 35} California Gold's marketing contract obligates it to market the Down treasure, and obligates RLP and CADG to pay California Gold a set amount in commission for each item of Down treasure which California Gold sells. Thus, until the Down treasure is recovered and curated, California Gold cannot begin to truly market the Down treasure for sale. Indeed, until the Down treasure is recovered, California Gold has no way of knowing exactly how many gold bars, gold ingots, or other numismatic items there will be to offer for sale. As the previous marketing campaign occurred almost 15 years ago, new marketing efforts will have to be undertaken once the Down treasure is recovered and curated. Because California Gold has yet to sell a piece of Down treasure, and the receiver accordingly has not paid California Gold any amount

in commission, neither party has fulfilled its substantial obligations under the marketing contract. As such, the contract is executory.

C. *Undesirability and Interpretation of the 1999 Agreement*

{¶ 36} The trial court found the marketing contract undesirable in large part because of the limitation of liability contained in Recital C of the 1999 Agreement. California Gold asserts that the trial court erred in finding Recital C applicable to the Down treasure. The 1999 Agreement expressly provides that the "Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California." (1999 Agreement, Section 7.7.) Accordingly, we are bound to apply California law to interpret the contract.

{¶ 37} Under California law, a written contract must be read as a whole, and every part must be interpreted with reference to the whole. *In re Crystal Properties, Ltd., L.P.,* 268 F.3d 743, 747 (9th Cir.2001). The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. Cal.Civ.Code 1638. Contractual clauses are not to be construed in isolation, rather, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." Cal.Civ.Code 1641.

{¶ 38} The fundamental canon of interpreting written instruments is the ascertainment of the intent of the parties. *Ticor Title Ins. Co. v. Rancho Santa Fe Assn.,* 177 Cal.App.3d 726, 730, 223 Cal.Rptr. 175 (1986). *See also* Cal.Civ.Code 1636 (stating that "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"). *See also People v. Rabanales,* 168 Cal.App.4th 494, 505, 85 Cal.Rptr.3d 607, 616 (2008), quoting *Ben-Zvi v. Edmar Co.,* 40 Cal.App.4th 468, 473, 47 Cal.Rptr.2d 12, 14 (1995) (stating that, " '[w]here the parties have reduced their agreement to writing, their mutual intention is to be determined, whenever possible, from the language of the writing alone' ").

{¶ 39} "[C]ourts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory, inoperative or meaningless." *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 68 Cal.App.4th 445, 473, 80 Cal.Rptr.2d 329 (1998). "An

interpretation which renders part of the instrument to be surplusage should be avoided." *Ticor Title Ins. Co.* at 730. "Particular clauses of a contract are subordinate to its general intent." Cal.Civ.Code 1650. "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Cal.Civ.Code 1648. Additionally, in California, "[s]everal contracts relating to the same subject matters, between the same parties, and made as parts of substantially one transaction are to be taken together." Cal.Civ.Code 1642.

{¶ 40} If the terms of a promise are ambiguous or uncertain, courts may consider the circumstances surrounding the agreement to establish the "sense in which the promisor believed * * * that the promisee understood it." Cal.Civ.Code 1649; *People v. Shelton,* 37 Cal.4th 759, 767 (2006). "To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which is meant." *In Re Estate of Dye*, 92 Cal.App.4th 966, 976, 112 Cal.Rptr.2d 362 (2001). In the face of ambiguity, a court may admit parol evidence to interpret the contract. *Adams v. MHC Colony Park Ltd. Partnership*, 224 Cal.App.4th 601, 620, 169 Cal.Rptr.3d 146 (2014). *See* Cal.Civ.Code 1647 (an ambiguous contract "may be explained by reference to the circumstances under which it was made, and the matter to which it relates").

{¶ 41} If a trial court considers the terms of the agreement, as well as the surrounding circumstances and the intent of the parties, a reviewing court may not substitute another interpretation, though the other interpretation seems equally tenable. *Pope v. Allen*, 225 Cal.App.2d 358, 365, 37 Cal.Rptr. 371 (1964). If, however, " ' the trial court's interpretation of a written instrument depends solely on the language of the document and no other evidence [was] before the court, a reviewing court is not bound by the trial court's construction, but may determine the contract's meaning as a matter of law.' " *Id.,* quoting 12 California Jurisprudence 2d 119, 326-27.

{¶ 42} The trial court and the receiver both assumed that the "Treasure" in the 1999 Agreement included the Down treasure. On appeal, the receiver continues to assert that Recital A "defines the 'Treasure' as the gold and silver 'that CADG has recovered, <u>and intends to recover</u>, from the *SS Central America*," and thus asserts that Recital C

"applies to both the Up Treasure and the Down Treasure." (Emphasis sic.) (Appellee's brief, 14.) The recitals from the 1999 Agreement state, in their entirety, as follows:

RECITALS

A. Certain of the Members of [California Gold] previously entered into an agreement in November 1998 with CADG for the purchase and/or marketing of certain gold and silver coins, gold bars, and other numismatic items (hereafter the "Treasure") that CADG has recovered, and intends to recover, from the *SS Central America*.

B. The November 1998 Agreement with CADG had been amended by Amendment No. 1 dated February 24, 1999, Amendment No. 2 dated in February 1999, and Amendment No. 3 dated August 1999, all of the foregoing documents are collectively hereafter referred to as the "Columbus Agreement" and is attached hereto, in its entirety, and as amended, as Exhibit 0.1 and has expired. While the Columbus Agreement [i.e. the 1998 agreement] concerned Recovered Gold Collectibles and Other Gold Collectibles (each as defined in the Columbus Agreement), this Agreement concerns only the Recovered Gold Collectibles and supercedes [sic] all prior agreements concerning the Recovered Gold Collectibles. Those provisions of the Columbus Agreement which concern solely the Other Gold Collectibles shall continue to survive and are, by this reference, made a part of this Agreement.

C. Purchaser recognizes Seller's interest in and desire for marketing of the Treasure in a diligent, professional and dignified manner consist [sic] with the scientific and historical significance of the Central America Project, its public identification with innovation, scientific discovery, entrepreneurship and historic preservation and maximization of the cultural value of its recoveries. Notwithstanding the foregoing nonbinding statement of desire set forth above in this paragraph, Purchaser or any assignee, or successor thereof, shall have the power to manage the marketing of the Treasure in its sole and absolute discretion and without any liability or obligation to the Seller or any other person.

D. Christie's International PLC holds a lien against the Treasure. Pursuant to an Asset Purchase Agreement (the "Christie's Agreement") to be executed concurrently

herewith, it will remove its lien. A copy of Christie's Agreement is attached as <u>Exhibit 0.2</u>.

E. Union Bank of California ("<u>Union Bank</u>") holds a judgment against CADG ("<u>Union Bank Judgment</u>"). Pursuant to a Discounted Payoff Agreement (the "<u>Union Bank Agreement</u>") previously executed and dated August 27, 1999, and as amended, October 29, 1999, and on the date hereof, Union Bank will, upon payment of $3,673,500 (inclusive of amounts previously paid pursuant to the Union Bank Agreement remove its judgment lien). A copy of the Union Bank Agreement is attached as <u>Exhibit 0.3</u>.

F.      The Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all of the assets, properties and rights concerning those certain Recovered Gold Collectibles as specifically set forth on <u>Schedule A</u> attached hereto (collectively, the "<u>Assets</u>").

NOW, THEREFORE, for and in consideration of the premises [sic] and mutual covenants and agreements contained herein, and intending to be legally bound hereby, the hereto hereby agree as follows[.]

(Recitals of the 1999 Agreement.)

{¶ 43} Thus, the term "Treasure" is defined in Recital A as "certain gold and silver coins, gold bars, and other numismatic items." (Recital A of the 1999 Agreement.) The receiver contends that Treasure means the gold and silver that CADG has recovered, and intends to recover, from the *S.S. Central America*. However, by using an integrated definition of the term Treasure, the term includes the words which precede the parenthetical reference, not the words which follow the parenthetical. *See* Kenneth A. Adams, *A Manual of Style for Contract Drafting* Section 5.34 (2d Ed.2008) (stating that "an integrated definition constitutes part of the substantive provisions of a contract, and the defined term is defined by tucking it at the end of the definition, in parentheses"). *Compare Olympus Ins. Co. v. AON Benefield, Inc.*, 711 F.3d 894, 898 (8th Cir.2013) (finding that the trial court properly "limited the definition of 'Subject Business' to those words preceding the parenthetical reference," and rejecting the appellant's contention that the definition "must also encompass the language following the integrated parenthetical"); *Berg v. eHome Credit Corp.*, 848 F.Supp.2d 841, 846

(N.D.Ill.2012) (noting that "one method of defining terms in an agreement is by placing a defined term in parentheses and quotation marks immediately following the definition of the term," and that as the term "Borrower" appeared "in parentheses and quotation marks after Stanley Berg and Ingrid Berg's names" the term "Borrower" included both Stanley and Ingrid Berg).

{¶ 44} If the parties had intended for "Treasure" to mean the "certain gold and silver coins, gold bars, and other numismatic items that CADG has recovered, and intends to recover, from the *SS Central America*," the definition of "Treasure" would have been placed at the end of the sentence. Notably, other defined terms from the 1999 Agreement similarly encompass the words which come before the parenthetical, and not the words which follow the parenthetical.[3] Moreover, in defining the terms Recovered Gold Collectibles and Other Gold Collectibles in the 1998 Agreement, the parties placed the recovered or yet to be recovered status of the treasure in front of the parenthetical. Thus, the parties defined Other Gold Collectibles as "any gold and silver coins and numismatic items (including, without limitation, bars) [CADG] or its affiliates, assigns, agents, or representatives recover and own, or have the legal right to market, from the SS *Central America* at any time following the date of this Agreement (the 'Other Gold Collectibles') upon the following terms and conditions." (1998 Agreement, Section 2.) The parties defined Recovered Gold Collectibles by stating that, "[a]s of the date of this Agreement, [CADG] has recovered from the SS *Central America* and retains those items listed on the inventory which is an Exhibit to the Agreement signed by Columbus and Dwight Manley on or about July 16, 1998, consisting of gold coins and numismatic items (the 'Recovered Gold Collectibles')." (1998 Agreement, Section 1.)

{¶ 45} Using the parties' definition of "Treasure" from Recital A, Recital C does not clearly apply to any particular portion of the treasure. However, as Recital B states

---

[3] *See* other terms defined in the recitals. *See also* other terms defined in the 1999 Agreement, including, for example, "any and all revenues or other value received by the owner or marketing agent of the Assets arising from its ownership of the Assets, including revenues from sale and/or promotion of the Assets, and any reproduction, merchandise or other thing or value made, manufactured or created that is derived from the Assets (collectively the "Gross Revenues"), less actual or reasonable 'direct costs of sale' "; "Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code")"; "the Purchaser shall indemnify and save harmless the Seller and its officers, directors, partners, shareholders, successors and assigns (collectively, the "Additional Indemnified Party") from and against any loss, claim, liability [and] damage." (1999 Agreement.)

that the 1999 Agreement "concerns only the Recovered Gold Collectibles," i.e. the Up treasure, Recital C's limitation of liability can apply only to the Up treasure. Moreover, applying the principals of California contract interpretation law, we must look at the entire agreement and interpret every part of the agreement in reference to the whole. Aside from the incorporation of the Down treasure provisions in Recital B, the entire 1999 Agreement concerns only the terms of the sale of the Up treasure. Indeed, the agreement is titled an "Asset Purchase Agreement," and all of the operative provisions in the contract concern the transfer of the Up treasure, the amount California Gold will pay for the Up treasure, and the general representation, warranties, and indemnification provisions relating to the transfer of ownership of the Up treasure. Moreover, to the extent the limitation of liability in Recital C is a particular clause, it is subordinate to the 1999 Agreement's general intent, which was to sell the Up treasure to California Gold. *See* Cal.Civ.Code 1650. Thus, looking at the contract as a whole and not reading Recital C in isolation, it is apparent that Recital C was intended as a limitation of liability regarding California Gold's conduct in marketing the Up treasure, which California Gold purchased through the 1999 Agreement.

{¶ 46} To the extent that the use of the term "Treasure" in Recital C renders the meaning of the limitation of liability in Recital C ambiguous, we may look to parol evidence to help determine the parties' intentions at the time of contracting. However, the only parol evidence in the record regarding the parties' intentions is the affidavit of Dwight Manley. Manley stated in his affidavit that he was actively involved in the negotiations for both the 1999 and 1998 Agreement. He averred that it was his "intent that the 1999 Asset Purchase Agreement applied <u>only</u> to the Up Treasure, and that all provisions in the [1998] Agreement relat[ing] to the Down Treasure survived, and continued to apply." (Emphasis sic.) (May 12, 2014 Affidavit, ¶ 4.) Manley averred that "[a]ll of the communications between the parties at that time were consistent with this contractual reality." (May 12, 2014 Affidavit, ¶ 4.) Manley's affidavit thus further indicates that the parties intended for the limitation of liability in Recital C to apply only to the Up treasure.

{¶ 47} The 1998 Agreement also indicates that Recital C was intended to apply solely to the Up treasure. Section 1 of the 1998 Agreement concerned only the Up

treasure. In Section 1, California Gold offered to pay $36 million for the Up treasure, and the agreement stated that, "[f]ollowing the transfer of the Recovered Gold Collectibles to [California Gold], [California Gold] shall be solely responsible for and shall control all additional marketing and curating costs relating to the Recovered Gold Collectibles." (1998 Agreement, Section 1(d).) The agreement then stated that California Gold "shall perform the services and shall manage marketing in a diligent, professional and dignified manner, consistent with the scientific and historical significance of the *Central America* project, its public identification with innovation, scientific discovery, entrepreneurship, and historic preservation, and maximization of the economic and cultural value of its recoveries." (1998 Agreement, Section 1(d).)

{¶ 48} The language from Section 1(d) of the 1998 Agreement tracks, nearly verbatim, the statement of desire contained in Recital C. Notably, there is no similar statement of desire contained in Section 2 of the 1998 Agreement, which contained the marketing contract for the Down treasure. Accordingly, if Recital C is ambiguous, based on the Manley affidavit and the identical language from Section 1(d) of the 1998 Agreement, we find that the parties intended for the limitation of liability in Recital C to apply only to the Up treasure.

{¶ 49} Because Recital C in the 1999 Agreement was intended to apply only to the Up treasure, the receiver's contention that the marketing contract with California Gold was undesirable because Recital C rendered California Gold immune from any liability with respect to the Down treasure, is unfounded. As the trial court similarly based its decision sustaining the motion to repudiate on the belief that Recital C in the 1999 Agreement applied to the marketing of the Down treasure, we find the trial court erred in granting the receiver's motion to repudiate.

{¶ 50} Although the limitation of liability in Recital C was the trial court's basis for granting the motion to repudiate, we note that the receiver has raised additional concerns regarding the marketing contract. For instance, the receiver asserts that the 1999 Agreement does not give the receiver the right "to affect the marketing of the Down Treasure or the price at which it is sold." (Appellee's brief, 20.) Similarly, in the receiver's motion to repudiate the marketing contract, the receiver stated that the marketing contract deprived "the Receiver of any control over the disposition of

substantially all of the receivership assets." (Receiver's Motion to Repudiate, 6.) These statements reflect a misunderstanding on the part of the receiver regarding the property rights it possesses in the Down treasure.

{¶ 51} "A common idiom describes property as a 'bundle of sticks' – a collection of individual rights which, in certain combinations, constitute property." *United States v. Craft*, 535 U.S. 274, 278 (2002). *See also* Eric A. Kades, *Property Rights and Economic Development*, 45 Wm. & Mary L.Rev. 815, 817-18 (2004) (explaining that, "[p]erhaps most famously, property law scholars speak incessantly of the 'bundle of sticks' that constitute property: various combinations of the rights to exclude, to use, and to alienate as the three sticks that, tied together, make up the bundle of rights we commonly associate with the word 'property' "). Pursuant to the marketing contract, California Gold possesses a single stick from the much larger bundle of rights which the receiver, on behalf of the receivership entities, possesses in the Down treasure. California Gold only has the right to market the Down treasure and offer it for sale. The receiver, as the owner, is the only individual with the power to dispose of the property. Accordingly, the receiver has every right to control the disposition of the Down treasure and determine the price at which the Down treasure will be sold.

{¶ 52} The receiver also asserts that the 1999 Agreement contains no performance standard for California Gold and does not require that sales of the Down treasure occur "at arms' length to bona fide third party purchasers." (Appellee's brief, 20.) As the trial court expressly found that California Gold did "an exceptional job in * * * marketing, [and] selling, etc., the Up Treasure," the receiver's concerns over California Gold's performance appear unfounded. (Decision, 5.) Moreover, we note that "[i]t has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 400 (2000), quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 658 (1958). "The scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract because the covenant 'is aimed at making effective the agreement's promises.' " *Id.*, quoting *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683 (1988). "Although breach of the implied covenant often

is pleaded as a separate count, a breach of the implied covenant is necessarily a breach of contract." *Digerati Holdings, LLC v. Young Money Entertainment, LLC*, 194 Cal.App.4th 873, 885, 123 Cal.Rptr.3d 736 (2011). Thus, pursuant to the implied covenant of good faith and fair dealing, the receiver will have a breach of contract claim against California Gold if California Gold does anything to injure the receiver's right to receive the benefits of the marketing contract.

{¶ 53} The receiver also notes that the 1999 Agreement does not provide for indemnification regarding the marketing of the Down treasure. However, Section 3 of the 1998 Agreement provides for indemnification, and states that CADG and California Gold "each agrees to protect, indemnify, and hold the other harmless from and against any and all expenses, damages, liabilities, * * * and costs whatsoever," which may be "incurred or suffered by the other in any claim * * * against a party to this agreement by a third party alleging any breach of warranty, covenant, representation, or other duty under this agreement by other party." (1998 Agreement, Section 3.)

{¶ 54} The receiver asserted below that this provision was not incorporated into the 1999 Agreement through the reference in Recital B, as it was not a provision which concerned solely the Down treasure. However, because the provisions regarding the Up treasure in the 1998 Agreement were superseded by the 1999 Agreement, the only operative provision remaining in the 1998 Agreement at the time of the 1999 Agreement was the marketing contract. Thus, at the time of the 1999 Agreement, the indemnification provision in Section 3 of the 1998 Agreement concerned solely the Down treasure and was accordingly incorporated by reference into the 1999 Agreement. Similarly, Section 4 of the 1998 Agreement states that "each party shall act as a fiduciary to the other in * * * accounting for any gold or silver coins and numismatic items recovered from the SS Central America." (1998 Agreement, Section 4.) Again, as all of the provisions relating to the Up treasure had expired and were superseded by the 1999 Agreement, the fiduciary obligation in Section 4 relating to accounting for the gold and silver recovered from the *S.S. Central America* concerned solely the Down treasure and was therefore incorporated by reference into the 1999 Agreement through Recital B.

## III. DISPOSITION

{¶ 55} Based on the foregoing, we find the trial court erred in accepting the receiver's erroneous interpretation of Recital C in the 1999 Agreement to support his sole claim of undesirability.  The relevant contract language does not support the receiver's contention that the receivership entities have "no control whatsoever with regard to the marketing of the Down Treasure."  Accordingly, we sustain appellant's assignment of error and reverse the judgment of the Franklin County Court of Common Pleas.  The case is remanded for further proceedings consistent with this decision.

*Judgment reversed; case remanded.*

SADLER and DORRIAN, JJ., concur.

_____