Filed 1/27/16  DeSantis v. Verni CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CARMELA DESANTIS, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> NICOLA VERNI, et al., <br><br> Defendants and Respondents. | F070981 <br><br> (Super. Ct. No. 10CEPR00639) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Robert H. Oliver, Judge.

Baker, Manock & Jensen, Joseph M. Marchini and John J. Waste for Plaintiff and Appellant.

McCormick, Barstow, Sheppard, Wayte & Carruth, Timothy L. Thompson and Nikole E. Cunningham for Defendants and Respondents.

-ooOoo-

This lawsuit pits a sister, Carmela DeSantis (Carmela), against two of her siblings, Nicola Verni (Nick) and Antonietta R. Verni (Rosa) (collectively respondents), in a dispute over the distribution of property from a trust their parents created.  The controversy concerns the legal effect of a trust amendment their father, Saverio Verni

(Saverio) executed about two weeks before his death.  The amendment included a provision instructing the trustee on how to apportion the residue of the trust estate among Saverio's five living children.

The issue presented to the trial court was whether lifetime gifts the children received from their parents should be considered in determining each child's equalized share of the trust's residue.  The trial court accepted respondents' position that the provision's express language showed it was not Saverio's intent to equalize lifetime gifts in the apportionment calculation.  On appeal, Carmela contends that the amendment is not ambiguous and requires each child to receive an equal share of all assets owned by Saverio individually, including substantial lifetime gifts that were made to some of the children.  Alternatively, she asserts that if the provision is ambiguous, the trial court erred when it refused to consider the extrinsic evidence of her father's intent, which requires us to remand the case for a new trial.

We conclude that the trial court did, in fact, consider extrinsic evidence of the circumstances surrounding the execution of the trust provision and correctly determined that the provision is not susceptible of the meaning Carmela ascribes to it.  Therefore, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Saverio and his wife, Leonarda Verni, had five children together: Maria Stanziale, Carmela, Nick, Rosa, and Leonardo Verni (Dino).  The Verni family immigrated to the United States from Italy in 1961 and eventually came to live in Clovis, California in 1973.  Saverio purchased 214 acres in Clovis, which is referred to as the Auberry Ranch, on which the family lived.  In 1974, Carmela and her husband, Pasquale DeSantis (Pat), who worked on the ranch, and Maria and her husband, moved off the ranch to work in their own respective businesses, while the three younger children remained on the ranch and worked there.

2.

On June 10, 1999, Saverio and Leonarda established the Verni Family Trust of 1999 (the trust). Before they created the trust, Saverio and Leonarda deeded certain properties to Rosa, Nick, and Dino: (1) in 1986, they deeded approximately 41 acres of land to Rosa, which is referred to as the Del Rey property; (2) in 1996, they deeded partial undivided interests of land in Madera County to Nick and Dino, which is referred to as the Chowchilla property; and (3) in 1997, they deeded most of the land that adjoined the ranch to Nick and Dino, which is referred to as "Auberry North." Sometime after the Auberry North property was deeded to Nick and Dino, a portion of that property was optioned to the De Youngs. Thereafter, Mr. De Young decided to exercise the option to part of the property; Nick and Dino received $500,000 each out of the transaction.

The trust provided that upon the death of the first spouse, the trust estate would be divided into three sub-trusts: (1) the Survivor's Trust; (2) the Marital Trust; and (3) the Family Trust (collectively the sub-trusts). The Marital and Family Trusts became irrevocable upon the first spouse's death, but the Survivor's Trust remained revocable until the surviving spouse's death. The distributive provisions of the Family Trust provided, inter alia, that Dino would receive all of the trust's interests in the assets of the Verni Olive Oil Co., the ranch property, and the Chowchilla property, while Nick was to receive a different portion of the Chowchilla property. The residue of the Family Trust was to be distributed in equal shares to Maria, Carmela, Nick and Rosa.

On June 11, 1999, Saverio and Leonarda executed the First Amendment to the trust. Among other things, it amended the distribution from the Family Trust to provide that the entirety of the Family Trust's interest in farming equipment should also be distributed to Dino.

The sub-trusts were created upon Leonarda's death on July 31, 1999. Between December 2000 and May 2007, Saverio amended the Survivor's Trust five times. The Second Amendment, executed in December 2000, disinherited Carmela and Maria because they sought to initiate a court challenge to the validity of the trust. The Third

3.

Amendment was executed in July 2003, after Saverio remarried. It provided his new wife, Erlinda Verni, with the right to occupy his residence until her death or remarriage, but otherwise disinherited her, and also disinherited Carmela, Maria and Rosa. The Fourth Amendment, executed a year later, reinstated the three daughters; left Dino and Nick property in Madera County; distributed the assets of the Verni Olive Oil Company, the farm machinery, and ownership interest in the Auberry Ranch equally between Nick, Dino and Rosa; and distributed the remaining assets in equal shares among the five children. The Fifth Amendment, executed in July 2005, only amended the designation of successor trustees.

In May 2007, Saverio executed the Sixth Amendment, which reaffirmed the distribution of interests in the Madera County property to Dino and Nick; reaffirmed Erlinda's life estate in Saverio's residence; distributed the Survivor's Trust's interest in the Verni Olive Oil Company and farm machinery only to Dino; distributed the improvements on the Auberry Ranch, and 50 percent of the land, to Dino, and divided the remaining 50 percent interest in the Auberry Ranch land equally among Rosa, Maria, Carmela and Nick; granted Dino a 50 percent interest in 134 acres located on Auberry Road, with the remaining 50 percent interest divided among the other four children; distributed to Erlinda real property located on Fresno Street; distributed 36.19 acres of real property off of Auberry Road equally to Dino and Nick; distributed 133 acres of real property in Sanger equally to Maria, Carmela and Nick, and another piece of property in Sanger only to Nick; distributed three parcels totaling approximately 15 acres off of Auberry Road equally to Maria and Carmela; and distributed nine parcels of real property comprising 191.66 acres in Fresno County equally to Nick, Maria and Carmela. Any residue of the Survivor's Trust's estate would be distributed equally to the five children.

In January or February 2008, Saverio was diagnosed with lung cancer. Before Saverio's diagnosis, Carmela sometimes talked to Saverio about her feelings on how the assets were to be distributed. Carmela would say "They got this, they got this, and me – I

4.

never get anything." Saverio responded, "Don't worry. You know, things will be okay[,]" and "I'll take care of you." Carmela mentioned to him the specific things the others had received. She said that Rosa "got 40 acres"; Saverio responded "Well, what are you going to do?" and "Your mom made me do it." When Carmela asked Saverio where her 40 acres were, Saverio answered, "Don't worry." They also talked about the Chowchilla property that Nick received; Saverio always said, "Don't worry about it." She also complained that Dino got the land "next to Auberry"; Saverio said he knew what he was doing, not to worry about it, and "[e]verybody is going to be equal[,] [e]verybody is going to be okay."

Saverio had surgery around March 2008 and then returned home. Thereafter, Carmela frequently visited Saverio at his home and again discussed equalizing the siblings. Carmela was concerned that she and Maria were not getting what Carmela perceived to be an equal share, so she sometimes asked Saverio whether he would change some things so she could get more. Carmela told Saverio many times that he needed to make sure everything was equal, so the siblings would be content and happy. Whenever she asked Saverio about changing the trust, Saverio would make statements such as "Don't worry. I'll take care of it. It will be all right. I know what I'm doing." Carmela testified that Saverio, however, "was the boss. You couldn't tell him what to do[,]" and "what he wanted to do, it was all on his own time."[1]

According to Carmela, Nick wanted to make sure Saverio understood that everything needed to be equal because the siblings were going to fight and told her she needed to talk to Saverio "because things don't look good with the Trust." Later in 2008,

---

[1] Pat, Maria and Dino similarly testified, either at trial or in deposition, that Saverio said that "[e]verybody is going to be equal no matter what they say[,]" or that he "wanted everything to be equal[,]" and "was trying to work things out." According to Dino, Saverio "was very independent. No one told him what to do, you know, that kind of thing."

Carmela told Saverio that Nick said Saverio needed to "do the right thing" and she agreed with Nick that "things need to be even," to which Saverio said, "Don't worry. I know what I'm doing."

In October 2008, Saverio executed the Seventh Amendment, which struck the previous distributions, reaffirmed that Erlinda was to receive a life estate in his residence, and provided that the residue of the Survivor's Trust be distributed in equal shares to the five children as follows: "The Trustee shall determine the total distribution due to the five children of the Settlor . . . following the death of Saverio Verni from all sources other than the Survivor's Trust, including the following: [¶] 1. The Marital Trust created under the Verni Family Trust of 1999, and amendments thereto; [¶] 2. The Family Trust created under the Verni Family Trust of 1999, and any amendments thereto; [¶] 3. Any annuities or pay-on-death accounts (POD accounts) or other similar financial vehicles payable after the death of the Settlor, including joint accounts. [¶] The Trust shall treat the above described distributions from sources other than the Survivor's Trust (if any), as an advance on the Survivor's Trust. The residue of the Survivor's Trust shall b[e] distributed equally to the Settlor's five children after deduction of any advances on the Survivor's Trust pursuant to the following direction: [¶] The Trustee shall total the advances and the assets of the Survivor's Trust. The Trustee shall divide the total by five to determine the total amount due to each beneficiary if no advances had been made. Each beneficiary who did not receive an advance receives that amount (or to the extent said funds are available from the Survivor's Trust should there be insufficient funds to pay the full amount). The share of a beneficiary who received an advance is reduced by the amount of the advance."

At a gathering in November 2008 at which the whole family was present, Pat raised the issue of who owned the Auberry North property. According to Pat, Saverio responded, "I paid for everything, and I own it, and I'm the boss." After that, everyone got upset and started to fight.

Saverio was hospitalized for the last time at the beginning of May 2009. On May 12, 2009, Maria and Carmela were with Saverio in his hospital room when Saverio's attorney, John Barrus, came in. According to Carmela, Barrus and Saverio told the two women to leave the room because "they had things to do." Barrus met privately with Saverio in the room.[2] When they were done, Barrus called the two women and said their father wanted to see them. Saverio told them to sit down and said "I just did the Will with Mr. Barrus. I signed the papers. I did [an] equal share to everybody. And whoever got prior stuff from me, they needed to put it back in the Trust."

This was the only discussion Carmela had with Saverio about the trust before his death on May 25, 2009. Saverio did not tell Carmela what he intended to do with Barrus before Barrus' arrival; the only knowledge she had about what Saverio might have done with Barrus was Saverio's statement to her after his meeting with Barrus. Saverio also did not tell her what property or gifts he was referring to when he said that whoever got more had to put it back in. According to Pat, Saverio never told him directly that he intended to see a lawyer to make any particular change to his trust, but Saverio did say, "I got to fix things. I got to fix things."

Saverio executed the Eighth Amendment on May 12, 2009, which amended the Survivor's Trust in its entirety. The amendment lists specific distributions to be made on Saverio's death after the payment of trust expenses, namely $200,000 to Erlinda,

---

[2] According to a note of the meeting that Barrus prepared later, after Barrus generally reviewed the terms of Saverio's estate planning documents with Saverio, Saverio confirmed the following: (1) he wanted Nick and Dino to be his trustees, executors, and agents; (2) he wanted all of the assets to be divided among his children and if a child died, then all would be given to his or her survivor; (3) he wanted to leave his wife $200,000 instead of giving her the right to live in the house; and (4) he wanted to give $200,000 to St. Anthony's of Padua Catholic church. They discussed gifting assets to his children and grandchildren; Saverio was fine with giving gifts to his children, but did not want to make gifts to his grandchildren, and agreed to give Nick the power to gift. They also discussed gifting the Shaw ranch to his children, which Saverio was fine with. Finally, Saverio wanted to gift the olive oil company's assets to Nick and Dino.

$200,000 to a Catholic church, and the distribution of Verni Olive Oil Company's business assets in equal shares to Nick and Dino. Article IV, section B(1), governs the administration of the residue of the Survivor's Trust's estate as follows: "Apportionment into Separate Trusts. The Trustee shall apportion the residue of the trust estate, in equal shares, for Trustor's then living children. The Trustor acknowledges that such beneficiaries have received and may or will receive distributions from (a) Trustor during his lifetime; (b) The Verni Family Trust of 1999 Survivor's Trust; (c) The Verni Family Trust of 1999 Marital Trust; (d) The Verni Family Trust of 1999 Family Trust; (6) (*sic*) proceeds of annuities, pay-on-death investment or similar cash accounts, proceeds of life insurance and similar assets payable to such beneficiaries as a result of the death of Trustor. The Trustor desires that each of these beneficiaries receive an equal share (in value but not in necessarily an equal share of each asset) of all assets owned by The Verni Family Trust of 1999 Survivor's Trust; The Verni Family Trust of 1999 Marital Trust; The Verni Family Trust of 1999 Family Trust or by Trustor individually or as a result of Trustor's death. Accordingly, the Trustor directs the Trustee to apportion the remaining assets of The Verni Family Trust of 1999 Survivor's Trust among these beneficiaries so that, insofar as reasonably possible, as determined by the Trustee in its discretion, the value of the assets received by these beneficiaries from all sources is approximately equal. For purposes of this calculation, the Trustee shall use the fair market value of the assets as of the date of Trustor's death. The Trustee need not physically segregate these various shares, except as may be required by the termination of any of these trusts, but may, instead, keep separate accounting records for each share." (The Equalization Provision.)

On Saverio's death, the Survivor's Trust became irrevocable; Nick succeeded as trustee of the Survivor's Trust while Rosa succeeded as trustee of the Family Trust; and, for purposes of distribution, the Marital Trust's remaining principal was to be merged with the corpus of the Family Trust.

8.

Carmela, as beneficiary of the sub-trusts, filed this action under Probate Code section 17200[3] to obtain a judicial determination of the proper construction of the Equalization Provision. Carmela alleged that during Saverio's lifetime, numerous distributions of real and personal property were made to Nick, Dino and Rosa, and specifically mentioned four transfers of real property to them. Carmela alleged that these distributions, and others, must be accounted for in order to give effect to the Equalization Provision, and the failure to account for these "lifetime distributions" would result in a vastly reduced final distribution to herself and Maria. Carmela asked for a judicial determination that the Equalization Provision requires determination of the value of material distributions made during Saverio's lifetime, as well as those to be made upon or after his death, when apportioning the Survivor's Trust's assets.

Respondents filed a response to the petition, in which they asserted that the sources to be distributed in the Equalization Provision consist of assets owned by the sub-trusts and Saverio individually, or that result from Saverio's death. Respondents further asserted they had not discovered any assets that Saverio owned individually at the time of his death other than a checking and savings account with minimal balances, a $205,000 certificate of deposit which designated Dino as the pay-on-death beneficiary, $10,000 cash in a safety deposit box, and certain annuity contracts which directed payment to specified beneficiaries. Respondents alleged they added the certificate of deposit and cash to the sub-trusts, the annuities did not require equalization because they were payable to Saverio's children in equal shares, and the assets in the sub-trusts that the Equalization Provision applied to consisted of: (1) the Verni Olive Oil Company's assets, (2) a portion of the Auberry Ranch consisting of two parcels totaling about 212 acres which were held in the Marital and Family Trusts, (3) an undivided interest in two parcels

---

[3] Undesignated statutory references are to the Probate Code.

9.

in Madera County consisting of about 130 acres held in the Marital Trust, and (4) all farm machinery and equipment.

The matter proceeded to a bench trial, at which the trial court received evidence, which included documents and the deposition transcripts of Nick, Rosa, Dino and Maria, and took live testimony from Carmela and her husband, Pat, adducing the facts recited above. In her trial brief, Carmela asserted "[t]he precise issue tendered to the court is whether lifetime gifts received by the beneficiaries from their parents should be considered in determining each child's equalized share." At the court's direction, the parties submitted a list of deposition excerpts they wanted the court to review and consider, including objections thereto, as well as closing and reply briefs.

In her closing brief, Carmela argued that the Equalization Provision unambiguously provided for equalization of lifetime distributions, specifically the Auberry North ranch, the Chowchilla property, the 40 acres deeded to Rosa, and large sums of cash. She further argued that if the court felt it needed to extend its analysis beyond the plain text of the provision, the extrinsic evidence established that the Equalization Provision was executed in response to Saverio's daughters' and Nick's concerns about equal treatment. In their closing brief, Respondents argued that Carmela's interpretation was contrary to the Equalization Provision's express language, which showed that Saverio did not intend to equalize lifetime gifts, but instead only intended to equalize distributions from the Marital, Family and Survivor's Trusts, and distributions from annuities and pay-on-death accounts. Respondents further argued there was no credible evidence to suggest that Saverio intended to equalize lifetime gifts.

The trial court issued a statement of decision upon consideration of the evidence and the parties' arguments, in which it found: (1) the Equalization Provision's express language shows that Saverio did not intend to equalize lifetime gifts in the provision's apportionment calculation, including the Chowchilla property, Auberry property, the De Young option, or Rosa's 40 acres; (2) in effecting the Equalization Provision, Saverio did

not intend that the language referring to "distributions from (a) Trustee during his lifetime" would include the previous lifetime gifts, distributions or transfers Saverio made; and (3) Saverio did intend the equalization and apportionment to come from the sources set forth in (a) through (6) (*sic*) of the Equalization Provision. Judgment to that effect was entered subsequently.

## DISCUSSION

Carmela contends the trial court erred in interpreting the Equalization Provision's language regarding the apportionment calculation. She argues the provision unambiguously "requires 'each . . . beneficiary [to] receive an equal share' of 'all assets owned by . . . [Saverio] individually' in light of 'distributions from [Saverio] during his lifetime[,]'" which include "substantial lifetime gifts" that Saverio made to the beneficiaries. She asserts that no extrinsic evidence is needed to ascertain Saverio's intent, since his intent is "abundantly clear on the face of the instrument itself." Alternatively, Carmela contends that if we conclude the Equalization Provision is susceptible to two interpretations, and therefore ambiguous, the extrinsic evidence presented at trial bolsters her interpretation. In her view, the trial court, despite having heard testimony and received evidence of the circumstances surrounding the execution of the Eighth Amendment, *refused* to consider such evidence in interpreting the Equalization Provision, and instead looked only to its four corners in determining that it lacked ambiguity. Carmela urges us to determine that the trial court erred in deciding not to consider extrinsic evidence in interpreting the provision, and remand the matter for a new trial with instructions to consider the evidence.

*Consideration of Extrinsic Evidence*

We begin with Carmela's assertion that the trial court refused to consider extrinsic evidence, as it is based on a misapprehension of the trial court's statement of decision and the law concerning the role of extrinsic evidence in determining ambiguity.

11.

It is always appropriate for the trial court to provisionally admit evidence of the circumstances surrounding the execution of a will or trust for the purpose of placing itself in the position of the maker (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1440 (*Powell*); *Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453 (*Wells Fargo*)), and specifically to ascertain whether seemingly clear language is, in fact, ambiguous. (*Estate of Russell* (1968) 69 Cal.2d 200, 207 (*Russell*); see *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 22.) To determine ambiguity, the trial court examines the will or trust in the light of the circumstances surrounding its execution to ascertain what the testator or trustor meant by the words used. (*Russell*, *supra*, 69 Cal.2d at p. 212.) *If* extrinsic evidence reveals that particular language is ambiguous, i.e. that it is reasonably susceptible of two or more meanings claimed to have been intended by the testator or trustor, the trier of fact proceeds to the second step of weighing the extrinsic evidence to resolve the ambiguity and discern intent. (*Id.* at pp. 207, 212.) On the other hand, if the language is not reasonably susceptible to two or more meanings in light of the extrinsic evidence, there is no uncertainty arising from the will or trust and any proferred evidence attempting to show an intention different from that expressed in the words of the instrument is inadmissible. (*Id.* at p. 212.)

Carmela fails to distinguish between these two tiers of admissibility in considering extrinsic evidence. The record shows that at trial, both sides introduced extrinsic evidence of Saverio's intent when he executed the Eighth Amendment. It is apparent from the statement of decision that the trial court provisionally received this evidence and examined it to determine whether the Equalization Provision's language was reasonably susceptible to the interpretation Carmela offered, namely that Saverio intended the phrase "distributions from Trustor during his lifetime[,]" to include lifetime gifts in the equalization calculation. The trial court then determined that, in light of the extrinsic

12.

evidence, the language was *not* reasonably susceptible to this interpretation and, on that basis, found the provision was not uncertain and the evidence inadmissible.**4**

Hence, the trial court correctly undertook a provisional review of extrinsic evidence to ascertain whether the Equalization Provision was ambiguous. Consequently, we must determine whether the trial court erred when it determined that no ambiguity existed and interpreted the provision as not requiring the trustee to consider lifetime gifts when apportioning the residue of the Survivor's Trust.

*Interpretation of the Equalization Provision*

"'In construing a trust instrument, the intent of the trustor prevails and it must be ascertained from the whole of the trust instrument, not just separate parts of it.'" (*Wells Fargo, supra,* 20 Cal.App.4th at p. 453.) It is a fundamental rule that a will or trust "'is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible.'" (*Russell*, *supra*, 69 Cal.2d at p. 205;

_____

**4** Carmela's assertion that the trial court refused to consider extrinsic evidence is based on the following footnote in the statement of decision: "Extrinsic evidence can only be considered if the Court finds the language of the Trust to be ambiguous or reasonably susceptible to more than one interpretation. (*Estate of Dodge* (1971) 6 Cal.3d 311, 318.) However, here, because this Court finds the language and intent unambiguous, the Court does not consider and per the law must not consider the extrinsic evidence presented by Petitioner because extrinsic evidence cannot be used 'to give [the Trust] a meaning to which it is not reasonably susceptible.' (*…Russell* [*supra*] 69 Cal.2d [at p.] 211.) This Court finds that the meaning Petitioner attempts to give to the Eighth Amendment is one which is not reasonably susceptible."

We do not agree that this footnote shows that the trial court refused to consider extrinsic evidence when determining whether an ambiguity existed. This is because the trial court explicitly stated that it considered the evidence in determining ambiguity when it explained that it did not "find the express language of [the] Eighth Amendment to be unclear or incomplete or unambiguous on its face in light of the Court's analysis and evidence presented[,]" and that in reviewing the facts and circumstances, as well as the "totality of the evidence before the Court, the Court cannot find that the inclusion of specific lifetime gifts or transfers . . . in the apportionment analysis would be a reasonably susceptible analysis and interpretation of the written language before the Court or the intent of Saverio."

see § 21102, subd. (a) ["[t]he intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."].)  Thus, where the language of a trust is definite, certain, and unambiguous, the testator's intention should be ascertained from the "four corners" of the instrument.  (See *Estate of Barnes* (1965) 63 Cal.2d 580, 582-583; *Estate of Nunes* (1954) 123 Cal.App.2d 150, 155; see *Citizens Business Bank v. Carrano* (2010) 189 Cal.App.4th 1200, 1205, 1207.)

As explained by our Supreme Court, extrinsic evidence of the circumstances under which a written instrument was made is """"admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible" [citation], and it is the instrument itself that must be given effect.  [Citations.]' [Citation.] 'If the evidence offered would not persuade a reasonable man that the instrument meant anything other than the ordinary meaning of its words, it is useless.'"  (*Russell, supra,* 69 Cal.2d at p. 211, fn. omitted.)  In other words, a document is ambiguous when "'the written language is fairly susceptible to two or more constructions.'"  (*Ibid.*)

Ambiguities in a written instrument are either patent (arising from the face of the writing) or latent (based on consideration of extrinsic evidence).  (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360; *Russell*, *supra*, 69 Cal.2d at p. 207.)  "A latent ambiguity is one which is not apparent on the face of the [trust] but is disclosed by some fact collateral to it."  (*Russell*, *supra*, 69 Cal.2d at p. 207.)

"An ambiguity arises when language may be applied in more than one way.  To say that language is ambiguous is to say there is more than one semantically permissible candidate for application, though it cannot be determined from the language which is meant.  *Every substantial claim of ambiguity must tender a candidate reading of the language which is of aid to the claimant.*  One must ask what meanings are proffered and examine their plausibility in light of the language.  A party attacking a meaning succeeds only if the attacker can propose an alternative, plausible, candidate of meaning."  (*Estate of Dye* (2001) 92 Cal.App.4th 966, 976 (*Dye*), italics added; see *City of Sacramento v.*

*Public Employees' Retirement System* (1994) 22 Cal.App.4th 786, 793-795 [discussing claim of statutory ambiguity].) However, an ambiguity, whether patent or latent, must reside in the trust. (*Dye*, *supra*, 92 Cal.App.4th at p. 978; see *Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1554 ["evidence of the meaning the parties gave to the contract language is only relevant if the contract language itself is reasonably susceptible to that meaning"].)

The parties disagree on the standard of review. Carmela argues that we must independently interpret the trust, while respondents contend our review is for substantial evidence. We agree with Carmela, as the extrinsic evidence offered was not conflicting.

Absent a conflict in the relevant extrinsic evidence, interpretation of a trust instrument is a question of law which we consider de novo. (*Powell, supra,* 83 Cal.App.4th at pp. 1439-1440.) On appeal, we review independently the threshold question of whether the contractual language is ambiguous and whether proffered extrinsic evidence is therefore relevant to prove a meaning to which the language is reasonably susceptible. (*ASP Properties Group v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1267.) Where the extrinsic evidence is not in conflict, construction of the contract is a question of law, and the appellate court independently construes the writing. (*Id.* at pp. 1267–1268, & fn. 4.) When competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence. Furthermore, if the extrinsic evidence is not itself conflicting, but the parties draw conflicting inferences, we will independently draw inferences and interpret the contract. (*Id.* at p. 1268, fn. 4.) As is clear from this summary, our responsibility on appeal is to review the words of the trust along with the extrinsic evidence that was before the trial court and determine, de novo, whether the agreement is reasonably susceptible to the interpretation offered by Carmela. (*Id.* at p. 1267; *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 22, fn. omitted ["We review the agreement and the extrinsic evidence de novo."].)

First, we conclude that there is no patent ambiguity in the Equalization Provision. As stated in the first sentence, it requires the trustee to apportion the residue of the Survivor's Trust "in equal shares, for Trustor's then living children." In the second sentence, Saverio "acknowledges" that his living children "have received and may or will receive distributions from (a) Trustor during his lifetime[,]" as well as from the three sub-trusts and other assets payable to them on Saverio's death. The third sentence states Saverio's intent that each child receive "an equal share" of "all assets owned by" the sub-trusts, "or by Trustor individually or as a result of Trustor's death." To effectuate this intent, the fourth and fifth sentences direct the trustee to apportion the Survivor's Trust's remaining assets among the beneficiaries, "insofar as reasonably possible" in the trustee's discretion, so that "the value of the assets received by these beneficiaries from all sources is approximately equal[,]" based on the fair market value of the assets as of the date of Saverio's death. Under the provision's plain language, the assets to be equalized, i.e. the assets from "all sources[,]" are those listed in the third sentence that were owned by Saverio, or present in the sub-trusts, at the time of Saverio's death. Since "all sources" does not include distributions made during Saverio's lifetime, there is no requirement that the trustee equalize any lifetime gifts, transfers or distributions.

Carmela contends this interpretation is contrary to the rule which states that words of an instrument are to be interpreted in a way that can "give every expression some effect," rather than one that will render any expression inoperative. (§ 21120; see *Estate of Simoncini* (1991) 229 Cal.App.3d 881, 889 ["Another fundamental rule of the interpretation and construction of wills requires that every word should be considered and given some effect, if possible."].) She argues that by reading the provision to exclude "distributions from . . . Trustor during his lifetime" from the sources to be equalized, that phrase is not given any effect, and therefore that interpretation is incorrect.

This interpretation, however, does not render the second sentence, which contains the "during his lifetime" language, ineffective. By acknowledging that his children had

16.

received, or may or will receive, "distributions" during his "lifetime," Saverio was reserving the right to distribute assets outside the trust in the way he saw fit. The acknowledgement serves as a recognition that distributions had or may be made, but they are not to be included in the equalization formula. This is not unlike an intent to disinherit a person claiming to be a pretermitted heir, which intent must be clearly stated on the face of the will. (§ 21621.) Here, Saverio clearly stated his intent that lifetime distributions were *not* to be included when equalizing the residue of the Survivor's Trust.

Carmela contends her interpretation of the Equalization Provision is the only plausible one. She asserts the provision: (1) first "acknowledges that some beneficiaries have received distributions from, among other sources, the 'Trustor during his lifetime'"; (2) states that Saverio "wants each beneficiary to receive an equal share of all assets that had been owned by the various Trusts or by the Trustor individually'"; and (3) directs the trustee to apportion the remaining assets in such a way that the distributions received "from all sources[,]" including the "distributions from Trustor during his lifetime," are approximately equal in value. Under this interpretation, the phrase "all sources" refers to those assets listed in the second sentence, not the third, thereby including "distributions" made during Saverio's "lifetime" which, according to Carmela, encompasses lifetime gifts such as the "substantial *inter vivos* gifts of property" Saverio made to his other children.

This interpretation, however, is not supported by the provision's plain language. The third sentence states that Saverio "desires" that each beneficiary receive "an equal share" of all assets "owned by" the sub-trusts, Saverio individually, or that result from Saverio's death, not, as Carmela assets, those assets that "had been owned by" the sub-trusts or Saverio individually. The phrase "owned by" implies that the assets to be equalized are those that are either in the sub-trusts, or owned by Saverio individually, as of the time of his death. Significantly, this sentence does not state that Saverio desires the beneficiaries to receive an equal share of lifetime gifts; neither does it list the specific

17.

gifts of property, including the Del Rey property, the Chowchilla property, the Auberry North property, or the money Nick and Dino received from the De Young option, that Carmela claims must be equalized. Since the third sentence states Saverio's intent that the beneficiaries receive equal shares of the assets listed in that sentence, which do not include lifetime gifts, distributions, or transfers, the "from all sources" phrase in the fourth sentence cannot be read to include lifetime gifts, distributions or transfers.[5]

Because the Equalization Provision is not ambiguous on its face, the issue turns on whether extrinsic evidence of the circumstances under which Saverio executed the Eighth Amendment reveals a latent ambiguity. Carmela asserts the extrinsic evidence shows that she spoke to her father on multiple occasions about the importance of equalizing distributions among the siblings and Nick even asked her to speak to her father about that; in response, Saverio would assure his daughters that they did not need to worry; that during his final hospital stay, Saverio summoned his estate planning attorney to his side for one final amendment to his testamentary trust; and after that meeting, Saverio told Carmela and Maria that he had revised his will and "did equal share to everybody [and] whoever got prior stuff from me, they needed to put it back in the Trust." She claims this evidence, along with the change in language from the Seventh to the Eighth Amendment, shows that Saverio intended to broaden the scope of the Equalization Provision to equalize distributions to each beneficiary "from all sources," including those "from Trustor during his lifetime."

Assuming the words attributed to Saverio are accurate as reported, Carmela has failed to raise any semantic ambiguity in the Equalization Provision itself. If Saverio

---

[5] Carmela argues that the trial court erred in finding that the term "distributions from . . . Trustor during his lifetime" does not include lifetime gifts. Citing both California and out-of-state authorities, she asserts "there is no logical, practical, or legal difference between giving a 'distribution' from one's personal assets and giving a 'gift.'" However, since lifetime distributions are not included in the "sources" to be equalized, it is irrelevant whether the "distributions" referenced in the second sentence include "gifts."

really meant what Carmela claimed he said, the provision would have stated that he desired to equalize lifetime gifts or distributions. Instead, it states that Saverio "acknowledges" that the beneficiaries had, may or will receive distributions during Saverio's lifetime, but he "desires" the beneficiaries to receive equal shares of all assets owned by the sub-trusts or Saverio individually, or that result from his death. This was the intent expressed in the Equalization Provision, which does not include lifetime gifts, distributions or transfers. Given the provision's language, extrinsic evidence cannot be used to give it a different meaning. Accordingly, we agree with the trial court that the Equalization Provision's language is not "reasonably susceptible" to the meaning Carmela advances.

We note that the trial court's initial task was not to decide the ultimate question of Saverio's intent – it was to decide the threshold question of whether, based on extrinsic evidence, Carmela tendered a plausible interpretation of what Saverio meant by the Equalization Provision other than what is set forth in its language. Our independent review of the record compels the conclusion that she did not. Because the evidence does not support more than one plausible candidate for meaning, there was no ambiguity to resolve and the trial court properly gave effect to the Equalization Provision according to its plain language, and nothing more.

## **DISPOSITION**

The judgment is affirmed.  Costs on appeal are awarded to respondents.

_____
GOMES, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.